Slip Op. 16-41

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| BELL SUPPLY COMPANY, LLC,<br><br>    **Plaintiff,**<br><br>v.<br><br>UNITED STATES,<br><br>    **Defendant,**<br><br>and<br><br>BOOMERANG TUBE LLC, TMK IPSCO TUBULARS, V&M STAR L.P., WHEATLAND TUBE COMPANY, MAVERICK TUBE CORPORATION, and UNITED STATES STEEL CORPORATION,<br><br>    **Defendant-Intervenors.** | Before: Claire R. Kelly, Judge<br><br>Court No. 14-00066<br>Public Version |

## OPINION AND ORDER

[Remanding the U.S. Department of Commerce's first remand redetermination revisiting its final scope ruling on green tubes manufactured in the People's Republic of China finished in countries other than the United States and the People's Republic of China.]

Dated: April 27, 2016

Donald Bertrand Cameron, Morris, Manning & Martin, LLP, of Washington, DC, for Plaintiff Bell Supply Company, LLC. With him on the brief were Julie Clark Mendoza, Rudi Will Planert, Brady Warfield Mills, Mary Shannon Hodgins, and Sarah Suzanne Sprinkle.

Loren Misha Preheim, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States. With him on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Claudia Burke, Assistant Director. Of counsel on the brief was Whitney Marie Rolig, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Roger Brian Schagrin, Schagrin Associates, of Washington, DC, for Defendant-Intervenors Boomerang Tube LLC, TMK IPSCO Tubulars, V&M Star L.P., and Wheatland Tube Company.  With him on the brief was John Winthrop Bohn.

Robert Edward DeFrancesco, III, Wiley Rein, LLP, of Washington, DC, for Defendant-Intervenor Maverick Tube Corporation.  With him on the brief were Alan Hayden Price and Tessa Victoria Capeloto.

Jeffrey David Gerrish, Skadden Arps Slate Meagher & Flom, LLP, of Washington, DC, for Defendant-Intervenor United States Steel Corporation.  With him on the brief were Robert E. Lighthizer, Nathaniel B. Bolin, and Luke A. Meisner.

Kelly, Judge:  Before the court for review is the U.S. Department of Commerce's ("Commerce" or "Department") remand redetermination filed pursuant to the court's decision in Bell Supply Co. v. United States, 39 CIT __, 83 F. Supp. 3d 1311 (2015) ("Bell").  Final Results of Redetermination Pursuant to Remand, Nov. 9, 2015, ECF No. 88-1 ("Remand Results").  On February 7, 2014, Commerce issued a final scope ruling determining that green tubes manufactured in the People's Republic of China ("PRC" or "China") used to process finished oil country tubular goods ("OCTG") in countries other than the United States and China are not substantially transformed and, therefore, OCTG finished in third countries that use such green tubes are within the scope of the antidumping and countervailing duty orders covering certain OCTG from China.  See Final Scope Ruling on Green Tubes Manufactured in the People's Republic of China and Finished in Countries Other than the United States and the People's Republic of China, PD 174–76, bar codes 3179952-01–03 (Feb 7, 2014) ("Final Scope Ruling");[1] see also

---

[1] The scope inquiry at issue here was initiated for the parallel antidumping duty and countervailing duty cases.  Unless otherwise noted, the court will cite to the administrative record for the antidumping duty proceeding.

Certain Oil Country Tubular Goods From the People's Republic of China, 75 Fed. Reg. 28,551 (Dep't Commerce May 21, 2010) (amended final determination of sales at less than fair value and antidumping duty order) ("ADD Order"); Certain Oil Country Tubular Goods From the People's Republic of China, 75 Fed. Reg. 3,203 (Dep't Commerce Jan. 20, 2010) (amended final affirmative countervailing duty determination and countervailing duty order) ("CVD Order") (collectively "Orders").  In Bell, the court held that Commerce unlawfully expanded the scope of the Orders by using a substantial transformation analysis without analyzing the language of the Orders.  See Bell, 39 CIT at __–__, 83 F. Supp. 3d at 1319–29.  Therefore, the court remanded the Final Scope Ruling instructing Commerce to "identify actual language from the scope of the Orders that could be reasonably interpreted to include OCTG finished in third countries in order to find that the merchandise is covered by the scope of the Orders."  Id. at __, 83 F. Supp. 3d at 1329. On remand, Commerce found the scope of the Orders to include green tubes manufactured in China, regardless of whether the green tubes are finished in countries other than the United States and China.  See Remand Results.

## BACKGROUND

The court assumes familiarity with the facts of this case as set out in the previous opinion ordering remand to Commerce and now recounts the facts as relevant to the court's review of the Remand Results.  See Bell, 39 CIT at __–__, 83 F. Supp. 3d at 1314–18.  On April 8, 2009, Defendant-Intervenors in this action along with other domestic companies (collectively "Petitioners") filed a petition requesting Commerce and the U.S. International Trade Commission ("ITC") to initiate antidumping and countervailing

duty investigations on imports of certain OCTG from China, alleging that imports of such merchandise were materially injuring or threatening material injury to an industry in the United States due to sales at less than fair value and countervailable subsidies.  See Petition for the Imposition of Antidumping and Countervailing Duties: Certain Oil Country Tubular Goods from the People's Republic of China Volume I, PD 192, bar code 3447542-01 (Mar. 9, 2016) ("Investigation Petition").

        After considering Petitioners' petition and supplemental submissions, Commerce and the ITC initiated parallel antidumping and countervailing duty investigations.  See Certain Oil Country Tubular Goods from the People's Republic of China, 74 Fed. Reg. 20,678 (Dep't Commerce May 5, 2009) (initiation of countervailing duty investigation); Oil Country Tubular Goods From the People's Republic of China, 74 Fed. Reg. 20,671 (Dep't Commerce May 5, 2009) (initiation of antidumping duty investigation); Certain Oil Country Tubular Goods From China, 74 Fed. Reg. 17,514, 17,514 (ITC Apr. 15, 2009) (institution of countervailing and antidumping duty investigations).  Commerce made affirmative final determinations in both the antidumping and countervailing duty investigations, finding that certain OCTG from China are being, or are likely to be, sold in the United States at less than fair value and that countervailable subsidies are being provided to producers and exporters of certain OCTG from China.  See Certain Oil Tubular Goods from the People's Republic of China, 75 Fed. Reg. 20,335 (Dep't Commerce Apr. 19, 2010) (final determination of sales at less than fair value); Certain Oil Country Tubular Goods From the People's Republic of China, 74 Fed. Reg. 64,045 (Dep't Commerce Dec. 7, 2009) (final affirmative countervailing duty determination).  The ITC subsequently determined

that the domestic industry is threatened with material injury by reason of imports of certain

OCTG from China that Commerce found to be subsidized by the government of China

and sold at less than fair value.  Certain Oil Country Tubular Goods from China, USITC

Pub. 4152 at 1, Inv. No. 731-TA-1159 (May 2010) ("USITC Pub. 4152"); Certain Oil

Country Tubular Goods From China, USITC Pub. 4124 at 1, Inv. No. 701-TA-463 (Jan.

2010) ("USITC Pub. 4124").

Thereafter, Commerce issued antidumping and countervailing duty orders

covering imports of certain OCTG from China.  See CVD Order, 75 Fed. Reg. at 3,203;

ADD Order, 75 Fed. Reg. at 28,551.  The scope of the Orders, which is coterminous with

the scope of the antidumping and countervailing duty investigations, defines the subject

merchandise as

> certain oil country tubular goods ("OCTG"), which are hollow steel products
> of circular cross-section, including oil well casing and tubing, of iron (other
> than cast iron) or steel (both carbon and alloy), whether seamless or
> welded, regardless of end finish (e.g., whether or not plain end, threaded,
> or threaded and coupled) whether or not conforming to American Petroleum
> Institute ("API") or non-API specifications, whether finished (including
> limited service OCTG products) or unfinished (including green tubes and
> limited service OCTG products), whether or not thread protectors are
> attached. The scope of the order also covers OCTG coupling stock.
> Excluded from the scope of the order are: casing or tubing containing 10.5
> percent or more by weight of chromium; drill pipe; unattached couplings;
> and unattached thread protectors.

CVD Order, 75 Fed. Reg. at 3,203–04; ADD Order, 75 Fed. Reg. at 28,553.

On March 26, 2012, Defendant-Intervenors TMK IPSCO Tubulars, Wheatland

Tube Company, Boomerang Tube LLC, V&M Star L.P. (collectively "Boomerang"), and

United States Steel Corporation ("U.S. Steel") submitted an application requesting

Commerce to initiate a scope ruling to determine whether the scope of the Orders expressly includes "unfinished OCTG produced in China – including so-called 'green tubes' – regardless of where the finishing of such OCTG takes place."   Petitioner's Application for Scope Ruling at 1, PD 1–3, bar codes 3065185-01–03 (Mar. 26, 2012). The scope ruling was requested in response to a U.S. Customs and Border Protection ("CBP") ruling on September 3, 2010 that green tubes and unfinished seamless steel pipes made in India, China or Russia subsequently heat treated in certain third countries became products of that third country.  See id. at Ex. 2 (CBP Ruling N118180: The country of origin of steel tubing processed in Korea or Japan from green tubes originating in India, China or Russia).  The applicants claimed that CBP's ruling conflicted with the scope of the Orders because, according to the factors enumerated under 19 C.F.R. § 351.225(k)(1) (2013),[2] "the plain language of the antidumping and countervailing duty orders expressly covers unfinished OCTG produced in China, regardless of where such OCTG is finished."  Id. at 5–6.  The applicants further argued that the scope of an order "is defined by the type of merchandise and by the country of origin," id. at 7, and that Commerce uses its substantial transformation test to determine the country of origin, which supports the conclusion that OCTG finished in third countries is within the scope. Id. at 11–12, 20.

On June 20, 2012, Commerce initiated a formal scope inquiry pursuant to 19 C.F.R. § 351.225(e) because it could not "determine whether the scope of the . . . [O]rders

---

[2] Further citations to Title 19 of the Code of Federal Regulations are to the 2013 edition.

on OCTG from the PRC expressly includes PRC-produced green tubes that are further processed in a third country prior to shipment to the United States based upon [the] application for scope clarification as contemplated by 19 CFR [§] 351.225(d)."  Initiation of Scope Inquiry, PD 25, bar code 3082712-01 (June 20, 2012).  In the Final Scope Ruling, Commerce determined that green tubes manufactured in China and finished in countries other than the United States and China are not substantially transformed and are thus within the scope of the Orders "where 1) the finishing consists of heat treatment by quenching and tempering, upsetting and threading (with integral joint), or threading and coupling; and 2) the products are made to the following specifications and grades: API specification 5CT, grades P-110, T-95 and Q-125."  Final Scope Ruling at 24.

Plaintiff Bell Supply Company, LLC ("Plaintiff" or "Bell Supply"), a U.S. importer of OCTG sourced from Chinese green tubes later heat treated and finished in Indonesia, commenced this action and subsequently filed a USCIT Rule 56.2 motion for judgment on the agency record contesting Commerce's Final Scope Ruling.  Plaintiff contended that Commerce's Final Scope Ruling unlawfully expanded the scope of the Orders by employing a substantial transformation analysis and ignored the statutory circumvention criteria in section 781(b) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677j(b) (2012),[3] which gives Commerce authority to include otherwise non-subject merchandise completed or assembled in third countries within the scope of an order if certain enumerated statutory requirements are met.  See Bell, 39 CIT at __, 83 F. Supp. 3d at

---

[3] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

1313.  Plaintiff additionally claimed that Commerce's substantial transformation analysis was not supported by substantial evidence.  See id.  After reviewing the Final Scope Ruling, the court in Bell held that Commerce had "failed to interpret the scope of the Orders and improperly expanded the scope language when it used a substantial transformation analysis to include OCTG finished in third countries without analyzing the language of the relevant Orders."  Id. at __, 83 F. Supp. 3d at 1314.  Because Commerce did not analyze the language of the Orders, the court did not reach whether Commerce's substantial transformation analysis was supported by substantial evidence and remanded the Final Scope Ruling for Commerce to conduct an interpretive analysis and "identify actual language from the scope of the Orders that could be reasonably interpreted to include OCTG finished in third countries in order to find that the merchandise is covered by the scope of the Orders."  Id. at __, 83 F. Supp. 3d at 1329.

Commerce revisited its determination from the Final Scope Ruling and issued its draft remand redetermination on September 18, 2015.  See Draft Results of Redetermination Pursuant to Remand, PD 2, bar code 3307183-01 (Sept. 18, 2015) ("Draft Remand Results").  In its Draft Remand Results, Commerce, under protest,[4] determined that "the scope language 'whether finished . . . or unfinished (including green tubes and limited service OCTG products)' can be reasonably interpreted to include unfinished OCTG from China, regardless of whether there is subsequent finishing in third

---

[4] The Court of Appeals for the Federal Circuit has held that even though Commerce may technically be the prevailing party where the Court of International Trade sustains its decision after remand, Commerce may adopt its position "under protest" to preserve its right to appeal. See Viraj Grp., Ltd. v. United States, 343 F.3d 1371, 1376 (Fed. Cir. 2003).

countries." Id. at 5.  In reaching its conclusion, Commerce found that "there is nothing in the scope language that limits 'unfinished' OCTG to those exports that remain unfinished upon importation into the United States." Id.  Commerce also found that its interpretation is confirmed by its evaluation of the petition from the antidumping and countervailing duty investigations and the ITC's threat analysis from its final injury determination.  Id. at 5–6. For these reasons, Commerce preliminarily interpreted the Orders to include green tubes from China, even if the green tubes are subsequently processed into finished OCTG in third countries.[5]  Id. at 6–7.  Commerce additionally noted that "because this finding applies only to unfinished OCTG from China, [it] will direct U.S. Customs and Border Protection . . . to collect cash deposits and assess antidumping and countervailing duties only on the value of the imported product that is attributable to the unfinished OCTG from China, and not on any portion of the value attributable to any finishing in third countries." Id. at 7.

Bell Supply submitted comments arguing that Commerce's Draft Remand Results do not comply with the court's remand order in Bell.  See Comments on Draft Results of Redetermination, CD 1, bar code 3401510-01 (Sept. 30, 2015).  Defendant-Intervenors Maverick Tube Corporation ("Maverick") and U.S. Steel each also submitted comments to the Draft Remand Results stating that while they continue to believe that the Final Scope Ruling was supported by substantial evidence and otherwise in accordance with

---

[5] Per regulation, when Commerce's assessment of the language of the scope, the scope ruling application, and the criteria under 19 C.F.R. § 351.225(k)(1) is dispositive, Commerce need not continue its interpretive analysis.  See 19 C.F.R. § 351.225(d), (k)(1).

law, Commerce's Draft Remand Results fully comply with the court's remand order in Bell

and that Commerce should make no changes in its final remand redetermination. See

Comments on the Draft Remand Determination, PD 6, bar code 3401778-01 (Sept. 30,

2015); Comments on Draft Results of Remand Redetermination, PD 5, bar code

3401699-01 (Sept. 30, 2015).

Commerce submitted its final remand redetermination to the court for review on

November 9, 2015.  See Remand Results.  Notwithstanding Bell Supply's comments,

Commerce maintained that, according to its interpretation of the scope language, the

Orders "include unfinished OCTG (e.g., green tubes) manufactured in China, regardless

of whether these unfinished OCTG products are finished in countries other than the

United States and China (i.e., third countries)."[6] Id. at 2.  Plaintiff filed comments with the

court contending that Commerce's Remand Results continue to be unsupported by

substantial evidence and otherwise not in accordance with law.  See Objections Pl. Bell

Supply Company, LLC Department Commerce's Final Results Redetermination Pursuant

Remand, Dec. 9, 2015, ECF No. 90 ("Bell Supply Comments").  Defendant, Maverick,

---

[6] With respect to the method for collecting and assessing antidumping and countervailing duties
to implement its remand redetermination, Commerce, after considering comments on the Draft
Remand Results, proposed a certification requirement which, if sustained, would require
importers to submit certification of the value of the unfinished portion of the imported finished
OCTG and the original producer and supplier to help calculate the applicable duty rate.  See
Remand Results 20–23.  However, if the importer is unable to provide such certification, CBP will
be directed to (1) apply the PRC-wide rate to the value of the unfinished portion of the
merchandise if the importer is unable to identify the original producer; (2) apply the applicable
producer rate to the full value of the importer merchandise if the importer is unable to identify the
value of the unfinished portion of the merchandise; or (3) apply the PRC-wide rate to the full value
of the imported merchandise if the importer is unable to identify both the value of the unfinished
portion of the merchandise and the original producer.  Id. at 22–23.

U.S. Steel, and Boomerang submitted replies to Bell Supply's comments arguing that Commerce's Remand Results comply with the court's remand order in <u>Bell</u> and should therefore be sustained.  <u>See</u> Def.'s Resp. Comments Remand Redetermination, Jan. 27, 2016, ECF No. 98 ("Def. Resp."); Maverick Tube Corporation's Reply Pl.'s Comments Final Results Redetermination Pursuant Court Remand, Jan. 27, 2016, ECF No. 100 ("Maverick Resp."); Rebuttal Def.-Intervenor United States Steel Corporation Pls.' Comments Final Results Redetermination Pursuant Court Remand, Jan. 27, 2016, ECF No. 103 ("U.S. Steel Resp."); Reply Def.-Intervenors Boomerang Tube LLC, TMK IPSCO, V&M Star LP, and Wheatland Tube Company Bell Supply's Comments Department Commerce's Final Results Redetermination Remand, Jan. 27, 2016, ECF No. 101 ("Boomerang Resp.").

        For the reasons set forth below, Commerce's conclusion on remand that the scope language "whether finished . . . or unfinished (including green tubes and limited service OCTG products)" includes Chinese green tubes that are subsequently processed into finished OCTG in third countries is not supported by substantial evidence, is not in accordance with law, and is not in compliance with the court's order in <u>Bell</u>.

## JURISDICTION AND STANDARD OF REVIEW

        The court has jurisdiction over Plaintiff's claim under 19 U.S.C. § 1516a(a)(2)(B)(vi) and 28 U.S.C. § 1581(c) (2012), which grant the court authority to review actions contesting scope determinations that find certain merchandise to be within the class or kind of merchandise described in an antidumping or countervailing duty order.  The court must "hold unlawful any determination, finding, or conclusion found . . . to be unsupported

by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19

U.S.C. § 1516a(b)(1)(B)(i).  "The results of a redetermination pursuant to court remand

are also reviewed 'for compliance with the court's remand order.'"  Xinjiamei Furniture

(Zhangzhou) Co. v. United States, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014)

(quoting Nakornthai Strip Mill Public Co. v. United States, 32 CIT 1272, 1274, 587 F.

Supp. 2d 1303, 1306 (2008)).

## DISCUSSION

The court held in its previous opinion that Commerce failed to interpret actual

words from the Orders to include Chinese green tubes finished in third countries within

the scope of the Orders.  See Bell, 39 CIT at __, 83 F. Supp. 3d at 1319–29.  On remand,

Commerce has determined that green tubes sourced from China that are later finished in

third countries are covered by the Orders based on its interpretation of the scope

language of the Orders.  See Remand Results.  Plaintiff argues that Commerce's

determination on remand does not comply with the court's remand order in Bell because

(1) Commerce failed to identify language from the scope of the Orders that can be

reasonably interpreted to include Chinese sourced OCTG finished in third countries, see

Bell Supply Comments at 6–7; (2) Commerce improperly shifted the burden to Bell Supply

to identify explicit exclusionary language by "conclud[ing] that it is reasonable to interpret

the term 'unfinished OCTG' to include finished OCTG that has been heat treated in

Indonesia because there is no language expressly prohibiting such an interpretation," see

id. at 7–11; (3) the petition and the ITC injury determination from the antidumping duty

and countervailing duty investigation did not support Commerce's conclusion, see id. at

14–21; and (4) Commerce's interpretation of the scope of the Orders was otherwise unreasonable.  <u>See</u> <u>id.</u> at 11–13.  Defendant argues in response that "Commerce, however, appropriately relied on the plain language of the scope when articulating its interpretation and reasonably determined that its interpretation was consistent with the intent expressed in the Petition and the results of the ITC's investigation."  <u>See</u> Def. Resp. 3–4.  The court finds that the language of the Orders does not necessarily include OCTG finished in third countries, even if processed using green tubes sourced from China.  Further, Commerce has not reasonably interpreted the scope language to include such merchandise because Commerce failed to point to evidence from the sources under 19 C.F.R. § 351.225(k)(1) to support its interpretation.  Therefore, Commerce's determination on remand is not supported by substantial evidence, not in accordance with law, and not in compliance with the court's order in <u>Bell</u>.

## A.    Legal Framework

An antidumping or countervailing duty order must "include[] a description of the subject merchandise, in such detail as the administering authority deems necessary."  19 U.S.C. §§ 1671e(a)(2), 1673e(a)(2); <u>see also</u> <u>Duferco Steel, Inc. v. United States</u>, 296 F.3d 1087, 1096 (Fed. Cir. 2002).  This description is referred to as the scope.  While Commerce's regulations provide that antidumping and countervailing duty orders "must be written in general terms," 19 C.F.R. § 351.225(a), Commerce is required by statute to write the scope of an order in such detail as Commerce deems necessary in order to "ensure[] that before imposing a significant exaction in the form of an antidumping duty, Commerce will provide 'adequate notice of what conduct is regulated by the order.'"  <u>Mid</u>

Continent Nail Corp. v. United States, 725 F.3d 1295, 1300 (Fed. Cir. 2013) (quoting Fuji

Photo Film Co. v. Int'l Trade Comm'n, 474 F.3d 1281, 1292 (Fed. Cir. 2007)).

        The statutory scheme makes clear that antidumping and countervailing duty orders

are country specific.   See 19 U.S.C. §§ 1671, 1673, 1677(25); see also 19 U.S.C.

§§ 1677b(a)(3), 1677j.   Commerce imposes countervailing duties upon merchandise if

"the government of a country . . . is providing . . . a countervailing subsidy with respect to

the manufacture, production, or export of a class or kind of merchandise imported, or sold

(or likely to be sold) for importation, into the United States."   19 U.S.C. § 1671(a)(1).

Commerce imposes antidumping duties upon "a class or kind of foreign merchandise

[that] is being, or likely to be, sold in the United States at less than its fair value."   19

U.S.C. § 1673(1).   The statute further defines subject merchandise as "the class or kind

of merchandise that is within the scope of an investigation, a review, a suspension

agreement, [or] an order."   19 U.S.C. § 1677(25).   These statutory provisions make clear

that antidumping and countervailing duty orders are intended to impose duties upon

certain merchandise from a particular country.   Thus, merchandise that is subject to an

antidumping or countervailing duty order must be (1) the type of merchandise described

in the order and (2) from the particular country or countries covered by the scope of the

order as written by Commerce.   Merchandise must meet both requirements to be subject

to an antidumping or countervailing duty order, otherwise the merchandise falls outside

the scope of the order.

        An order may need clarification "because the descriptions of subject merchandise

contained in the Department's determinations must be written in general terms."   19

C.F.R. § 351.225(a).  If a question arises as to whether certain merchandise is included

within the scope of an order, Commerce may conduct an inquiry to clarify the scope of an

order and determine whether such merchandise is included within the scope of an order.[7]

<u>See</u> 19 C.F.R. § 351.225(a).  Commerce has broad authority "to interpret and clarify its

antidumping duty orders."  <u>Ericsson GE Mobile Commc'ns, Inc. v. United States</u>, 60 F.3d

778, 782 (Fed. Cir. 1995) (citing <u>Smith Corona Corp. v. United States</u>, 915 F.2d 683, 686

(Fed. Cir. 1990)), <u>as corrected on reh'g</u> (Sept. 1, 1995); <u>see also</u> <u>King Supply Co., LLC v.</u>

<u>United States</u>, 674 F.3d 1343, 1349 (Fed. Cir. 2012).  However, under the statute and

regulations, as interpreted by the U.S. Court of Appeals for the Federal Circuit, Commerce

is limited to clarifying the scope based on the actual words of the order in interpreting the

scope.  <u>See</u> 19 C.F.R. § 351.225(k); <u>Duferco</u>, 296 F.3d at 1097.  The language of an

order dictates its scope.  The words of an order must serve as a basis for the inclusion of

merchandise within the scope of the order.  <u>Duferco</u>, 296 F.3d at 1096–97.  Commerce

may not interpret an order "so as to change the scope of that order, nor can Commerce

interpret an order in a manner contrary to its terms."  <u>Eckstrom Indus., Inc. v. United</u>

<u>States</u>, 254 F.3d 1068, 1072 (Fed. Cir. 2001) (citing <u>Wheatland Tube Co. v. United States</u>,

161 F.3d 1365, 1370 (Fed. Cir. 1998)).  "Scope orders may be interpreted as including

subject merchandise only if they contain language that specifically includes the subject

merchandise or may be reasonably interpreted to include it."  <u>Duferco</u>, 296 F.3d at 1089.

---

[7] A scope inquiry can either be self-initiated by Commerce or initiated by an application for a scope
ruling from an interested party.  <u>See</u> 19 C.F.R. § 351.225(b)–(c).

Commerce's regulations specify the circumstances and procedures for clarifying the scope of an order and issuing a scope ruling.  See 19 C.F.R. § 351.225.  If Commerce finds that the language of the scope is unambiguous with respect to the merchandise at issue, then it explains what it understands is the plain meaning of the scope and the inquiry ends there.  See ArcelorMittal Stainless Belg. N.V. v. United States, 694 F.3d 82, 84 (Fed. Cir. 2012); see also 19 C.F.R. § 351.225(d).[8]  However, if Commerce finds that the plain meaning of the scope is ambiguous, it then undertakes an interpretive analysis pursuant to the following criteria under 19 C.F.R. § 351.225(k) to determine if a particular product is included within the scope of an order:

> (k) Other scope determinations. . . . [I]n considering whether a particular product is included within the scope of an order or a suspended investigation, [Commerce] will take into account the following:
>
> > (1) The descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of [Commerce] (including prior scope determinations) and the Commission.

19 C.F.R. § 351.225(k)(1). Thus, in interpreting the words of an order, Commerce may look to the descriptions of the merchandise found in the petition, the investigation, and

---

[8] Under 19 C.F.R. § 351.225(d), Commerce may issue a final ruling without initiating a formal scope inquiry if Commerce can determine whether a product falls within or outside the scope of an antidumping or countervailing duty order based solely upon the scope ruling application and the descriptions of the merchandise in the petition, the underlying investigation, and determinations made by Commerce, including prior scope rulings, and the ITC.  See 19 C.F.R. § 351.225(d), (k)(1).  If Commerce receives an application for a scope ruling, Commerce must either issue a final ruling pursuant to 19 C.F.R. § 351.225(d) or initiate a formal scope inquiry pursuant to 19 C.F.R. § 351.225(e) within forty-five days of the date of receipt of a scope ruling application.  Once Commerce initiates a formal scope inquiry pursuant to 19 C.F.R. § 351.225(e), it follows the procedure set forth under 19 C.F.R. § 351.225(f) and (k).

past scope rulings and injury determinations to aid it in its interpretation of the scope language.  Id.; Smith Corona, 915 F.2d at 685.

Commerce may use the § 351.225(k)(1) sources only to clarify the words of an order.  Duferco, 296 F.3d at 1097 (citing Smith Corona, 915 F.2d at 686).  Although the petition and the investigation proceedings may aid in Commerce's interpretation of the final order, the order itself "reflects the decision that has been made as to which merchandise is within the final scope of the investigation and is subject to the order."  Id. at 1096–97.  If the considerations outlined in § 351.225(k)(1) are not dispositive, Commerce will then consider the following factors outlined in § 351.225(k)(2), which are often referred to as the Diversified Products criteria:

> (2) When the above criteria are not dispositive, [Commerce] will further consider:
>> (i) The physical characteristics of the product;
>> (ii) The expectations of the ultimate purchasers;
>> (iii) The ultimate use of the product;
>> (iv) The channels of trade in which the product is sold; and
>> (v) The manner in which the product is advertised and displayed.

19 C.F.R. § 351.225(k)(2); see also Diversified Prods. Corp. v. United States, 6 CIT 155, 162, 572 F. Supp. 883, 889 (1983).  Given this framework, if the words of the order, as clarified by the (k)(1) and (k)(2) factors, do not support the inclusion of the merchandise within the scope of the order, then the merchandise falls outside the order.

Commerce may nonetheless seek to include merchandise outside the scope of an order through statutory provisions tailored for specific circumstances set forth by Congress, in this case through 19 U.S.C. § 1677j(b) and further clarified by Commerce

under 19 C.F.R. § 351.225(h).[9]  See H.R. Rep. No. 100–576, at 599–600 (1988), reprinted

in 1988 U.S.C.C.A.N. 1547, 1632–33.  Congress has given Commerce the authority to

include otherwise non-subject merchandise that is of the same class or kind as subject

merchandise that is "completed or assembled in other foreign countries . . . within the

scope of [an antidumping or countervailing duty] order," provided that Commerce makes

five enumerated statutorily required findings.  See 19 U.S.C. § 1677j(b).[10]

---

[9] Commerce may make a scope determination under two different approaches.  If Commerce initiates a formal scope inquiry pursuant to 19 C.F.R. § 351.225(e), "Commerce may conduct formal circumvention inquiries pursuant to 19 C.F.R. § 351.225(g)–(j) and may conduct formal scope inquiries pursuant to 19 C.F.R. § 351.225(k)."  AMS Assocs., Inc. v. United States, 737 F.3d 1338, 1344 (Fed. Cir. 2013).  Commerce conducts a formal scope inquiry pursuant to 19 C.F.R. § 351.225(k) to determine if particular merchandise is included within the scope of an order.  See 19 C.F.R. § 351.225(k).  Conversely, Commerce conducts a formal circumvention inquiry pursuant to 19 C.F.R. § 351.225(g)–(h) to lawfully expand the reach of an antidumping or countervailing duty order to include otherwise non-subject merchandise within the scope of an order.  The authority to expand the scope of an order is reserved for inquiries regarding four specific circumstances, including where merchandise is completed or assembled in other foreign countries using merchandise that is subject to an order.  See 19 C.F.R. § 351.225(g)–(j).  Commerce's regulations direct Commerce to employ a scope inquiry pursuant to 19 C.F.R. § 351.225(k) "to those scope determinations that are not covered under paragraphs (g) through (j)."  See 19 C.F.R. § 351.225(k).  Thus, even where circumvention may apply, Commerce may seek to first determine whether certain merchandise may already be included within the scope of an order before determining whether an order can be lawfully expanded to cover the merchandise.

[10] Commerce may include merchandise that is completed or assembled in other foreign countries and subsequently imported into the United States within the scope of an antidumping and countervailing duty order if

    (A) merchandise imported into the United States is of the same class or kind as any merchandise produced in a foreign country that is the subject of . . . [an antidumping duty or countervailing duty order]

    (B) before importation into the United States, such imported merchandise is completed or assembled in another foreign country from merchandise which--

        (i) is subject to such order or finding, or

        (ii) is produced in the foreign country with respect to which such order or finding applies,

(footnote continued)

## B.     Commerce's Interpretation of the Orders

The scope of the Orders describes the subject merchandise as

> certain oil country tubular goods ("OCTG"), which are hollow steel products of circular cross-section, including oil well casing and tubing, of iron (other than cast iron) or steel (both carbon and alloy), whether seamless or welded, regardless of end finish (e.g., whether or not plain end, threaded, or threaded and coupled) whether or not conforming to American Petroleum Institute ("API") or non-API specifications, whether finished (including limited service OCTG products) or unfinished (including green tubes and limited service OCTG products), whether or not thread protectors are attached. The scope of the order also covers OCTG coupling stock. Excluded from the scope of the order are: casing or tubing containing 10.5 percent or more by weight of chromium; drill pipe; unattached couplings; and unattached thread protectors.

CVD Order, 75 Fed. Reg. at 3,203–04; ADD Order, 75 Fed. Reg. at 28,553.  In its Remand

Results, Commerce has determined that the scope of the Orders can be reasonably

interpreted to include an input or component, green tubes manufactured in China, which

is used to produce a finished product, OCTG finished in countries other than China and

the United States.  Commerce first claimed that the plain meaning of the scope language

"whether finished . . . or unfinished (including green tubes and limited service OCTG

products)" clearly includes Chinese green tubes finished in third countries.  As discussed

---

(C) the process of assembly or completion in the foreign country referred to in subparagraph (B) is minor or insignificant,

(D) the value of the merchandise produced in the foreign country to which the antidumping duty order applies is a significant portion of the total value of the merchandise exported to the United States, and

(E) [Commerce] determines that action is appropriate under this paragraph to prevent evasion of such order or finding,

[Commerce] . . . may include such imported merchandise within the scope of such order . . . at any time such order . . . is in effect.

19 U.S.C. § 1677j(b).  Commerce's regulations further clarify Commerce's authority to include such merchandise within the scope of an order.  See 19 C.F.R. § 351.225(h).

2baea3ae59a767fb

below, the plain meaning of the scope language identified by Commerce does not clearly

cover Chinese green tubes when finished in third countries.     Notwithstanding

Commerce's initial position that the plain meaning of the scope language covers the

merchandise at issue, Commerce attempted, but failed, to identify language from the

descriptions of the merchandise contained in the petition or the ITC's final injury

determination to support its interpretation of the Orders.

     Commerce initially looked to the language of the Orders to determine if the issue

can be resolved through the plain meaning of the scope language.  Commerce first found

that "[u]nfinished OCTG (including green tubes) from China clearly falls within the physical

description of merchandise covered under the *Orders*."  Remand Results 15.  This finding

would be conclusive if the question before Commerce was whether green tubes

manufactured in China are covered by the Orders.  No party disputes that the scope of

the Orders expressly includes both unfinished and finished OCTG from China.  However,

this finding does not answer the pertinent question of whether Chinese green tubes used

to process finished OCTG in third countries are nevertheless covered by the Orders

regardless of which country finishes the finished OCTG.

     Next, Commerce found that because unfinished OCTG from China clearly falls

within the scope of the Orders, "the plain language . . . can reasonably be interpreted to

include unfinished OCTG, even when finished in a third country."  Id.  It is unclear how

Commerce made this leap of logic, from finding that green tubes manufactured in China

are covered by the Orders to finding that Chinese green tubes finished in a third country

are covered by the Orders, by simply referring to the scope language.  Without any

additional explanation, Commerce concluded that the plain meaning of the scope language includes green tubes from China finished in a third country.   Commerce's conclusion, however, begs the question of whether OCTG finished in a third country using Chinese green tubes is covered by the scope of the Orders in the first place.

The only justification Commerce provided regarding its reading of the plain language is that "[t]he process of finishing does not remove the product from the plain language of the scope, which includes both unfinished and finished OCTG."  Id.  As the Orders include both unfinished and finished OCTG, Commerce deduced that the plain meaning of the scope language must also include Chinese green tubes even if there is subsequent finishing in third countries because "they are both 'OCTG' within the plain meaning of the scope language."  Id.  The court cannot accept this syllogistic reasoning without any additional evidence from the scope language supporting Commerce's assumption that third country processing does not remove the merchandise from the scope.  The scope language makes no mention of whether green tubes manufactured in China remain subject to the Orders even if the green tubes undergo further processing in a third country.  Commerce has not identified any specific language from the Orders that supports such a broad reading of the scope.  Commerce recognized that the final scope language does not make any reference to third country processing.  Id. at 16–17.  The language that Commerce relied upon shows that green tubes from China are covered by the Orders, but does not answer whether Chinese green tubes finished in third countries are intended to be covered by the Orders.

In reading the plain language of the scope of the Orders, Commerce reasoned that because "[b]oth unfinished OCTG and finished OCTG are in-scope merchandise . . . within the plain meaning of the scope language, . . . that language can reasonably be interpreted to include unfinished OCTG, even when finished in a third country." Id. at 15. When Commerce writes an order, it must identify the country or countries subject to the order. See 19 U.S.C. §§ 1671e(a)(2), 1673e(a)(2). While the Orders here expressly cover unfinished and finished OCTG, the language of the Orders only expressly includes such merchandise from China. Where appropriate, Commerce is free to describe specific production processes occurring in third countries otherwise not subject to an order that are intended to be covered by the order's scope. See, e.g., Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China, 77 Fed. Reg. 73,018, 73,018–19 (Dep't Commerce Dec. 7, 2012) (amended final determination of sales at less than fair value and antidumping duty order) (specifying that "[m]odules, laminates, and panels produced in a third-country from cells produced in the PRC are covered by this order"); Dynamic Random Access Memory Semiconductors from the Republic of Korea, 68 Fed. Reg. 47,546, 47,546 (Dep't Commerce Aug. 11, 2003) (notice of countervailing duty order) (including "[p]rocessed wafers fabricated in the [Republic of Korea], but assembled into finished semiconductors outside the [Republic of Korea] . . . in the scope"). The Orders could have been written to cover an input or component of certain merchandise from the subject country and ensure its corresponding value remained subject to an antidumping and countervailing duty order even if the input or component is further processed in a third country. Commerce could have written the

Orders to give effect to such a scheme, however, it did not.  Boomerang's and Maverick's

argument that it is unfeasible to require petitioners to include such language does not

persuade the court.[11]  The plain language of the Orders does not reference production

processes occurring in third countries to express an intent to cover green tubes from

China when subsequently processed in third countries into finished OCTG.  Tellingly,

Commerce could not find any language in the Orders that might speak to third country

processing.[12]  See Remand Results 16–17.

---

[11] Boomerang asserts that "[i]t is simply not possible to specify all the circumstances in which further processing of goods in a third country will remove them from the scope of an order." Boomerang Resp. 14.  Maverick also asserts that the "suggestion that the scope contain such limiting language at the outset of a proceeding is nonsensical."  Maverick Resp. 9.  Boomerang's and Maverick's argument is unpersuasive.  The merchandise described in the petition dictates the merchandise investigated in an antidumping or countervailing duty investigation.  Thus, it is incumbent upon the petitioners to make Commerce and the ITC aware of all imported merchandise from which the petitioners are seeking relief.

Boomerang also argues that the administration and enforcement of orders would be more difficult if third country processing is automatically excluded from the scope of an order.  See Boomerang Resp. 14.  The absence of express scope language is by no means an automatic exclusion of merchandise further processed in third countries.  However, the absence of express scope language regarding third-country processing may create an ambiguity as to whether such merchandise is covered by the scope of an order, which then calls upon Commerce to inquire whether the merchandise is subject to the order pursuant to the statutory and regulatory provisions promulgated to specifically address such ambiguities.

[12] Maverick and U.S. Steel argue that the orders referenced by the court are exceptional cases and not the general rule because "Commerce's normal and reasonable practice involving country of origin is to not require that scope language reference third-country processing in order to cover all subject imports where processing does not result in substantial transformation."  Maverick Resp. 8.  To support their claim, Maverick and U.S. Steel rely upon several past determinations. Maverick Resp. 8 (citing Certain Cold-Rolled Flat-Rolled Carbon-Quality Steel Products from Taiwan, 65 Fed. Reg. 34,658 (Dep't Commerce May 31, 2000) (notice of final determination of sales at less than fair value); Wax and Wax/Resin Thermal Transfer Ribbons from France, 69 Fed. Reg. 10,675 (Dep't Commerce Mar. 8, 2004) (notice of final determination of sales at less than fair value); Certain Artist Canvas from the People's Republic of China, 71 Fed. Reg. 16,116 (Dep't Commerce Mar. 30, 2006) (final determination of sales at less than fair value)); U.S. Steel Resp. 12 (citing Steel Wire Rod From Canada, 62 Fed. Reg. 51,572 (Dep't Commerce Oct. 1,

(footnote continued)

Commerce cannot use its failure to expressly include third country processing in writing the scope of the Orders and rely upon its own silence to further support its current interpretation.  Commerce did exactly that here and found that the absence of any reference to third country processing does not undermine its determination.  See id. Commerce's reading of the scope language is predicated on the misunderstanding that an antidumping or countervailing duty order can be interpreted to include certain merchandise because there is no express language excluding such merchandise. Supporting the inclusion of merchandise based on the lack of any exclusionary language is tantamount to shifting the burden to exclude certain merchandise on the party arguing for its exclusion, which the court in Bell made clear is incompatible with Duferco.  See Bell, 39 CIT at __–__, 83 F. Supp. 3d at 1328–29.  Commerce's rationale in this regard

---

1997) (notice of preliminary determination of sales at less than fair value); Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China, 59 Fed. Reg. 62 (Dep't Commerce Jan. 3, 1994) (affirmative preliminary determination of circumvention of antidumping duty order)).

However, the past determinations cited by Maverick and U.S. Steel dealt with the issue of whether merchandise is subject to the order if an input is exported from a third country to the subject country for further processing.  Thus, these cases might speak to the question of whether green tubes from third countries brought into China for further processing prior to importation are subject to the Orders, but do not answer whether green tubes from China remain subject to the Orders even when further processed in third countries.  As discussed in the court's previous opinion, the latter inquiry does not call for a substantial transformation analysis because the merchandise is exported from the subject country to a third country, which is a circumstance where Commerce may bring otherwise non-subject merchandise within the scope of an order through 19 U.S.C. § 1677j(b).  See Bell, 39 CIT at __–__, 83 F. Supp. 3d at 1325–27.  These past determinations fall under the former scenario where Commerce may conduct a substantial transformation analysis and do not support the contention that there was no need for Commerce or Petitioners to reference third country processing in order to include the merchandise at issue within the Orders.  That is not to say that Commerce is absolutely barred from engaging in a substantial transformation analysis where merchandise is exported from the subject country to a third country.  In Bell, the court determined that Commerce "failed to adequately explain . . . why the words of the Orders supported . . . the use of the substantial transformation analysis."  Id. at __–__, 83 F. Supp. 3d at 1322–23.  However, Commerce has changed course and chose not to continue to employ a substantial transformation analysis.

is inconsistent with the Court of Appeals for the Federal Circuit's declaration that "Commerce cannot find authority in an order based on the theory that the order does not deny authority." Duferco, 296 F.3d at 1096. "Commerce's order must be enforced based on what the order actually says, not on what Commerce wished the order had said." Belgium v. United States, 551 F.3d 1339, 1348 (Fed. Cir. 2009) (citing Duferco, 296 F.3d at 1097–98). The silence regarding third country processing caused the language of the Orders to be ambiguous. Thus, Commerce cannot rely upon the Orders' silence regarding third country processing as additional support to include Chinese green tubes finished in third countries within the Orders.

Given how Commerce crafted the scope of the Orders, OCTG sourced from green tubes manufactured in China later finished in third countries are not clearly covered by the plain terms of the Orders. The scope language is clear that the finishing process does not remove OCTG finished in China from the Orders. However, the scope language cannot be said to clearly include Chinese green tubes that are subsequently finished in countries other than China or the United States. Commerce theorized that the plain language of the scope on its own can be understood to include finished OCTG processed in third countries using Chinese green tubes, but the language is at best ambiguous with respect to such merchandise. Defendant argues that while antidumping and countervailing duties are country specific in that they only cover merchandise from particular countries, the scope of the Orders is not limited to green tubes that are imported directly from China. See Def. Resp. 7. Though scope language is not required to expressly refer to third country processing to include such merchandise, Commerce's

understanding of the plain meaning of the scope language and rationale for reaching its conclusion are not reasonable here.   Defendant additionally argues that there is "no support for defining the term 'from' to mean 'imported directly from.'"   Id.   However, Defendant's argument misses the point.   Neither the scope language nor the court's analysis focuses on from where goods are shipped.   The scope language describes merchandise produced in China that are subject to the Orders.   The merchandise at issue are produced, in part, in a third country.   Therefore, it is not clear if the scope of the Orders covers the merchandise at issue.   Because the scope language of the Orders is ambiguous regarding Chinese green tubes later finished in third countries, Commerce was required to continue its interpretive analysis in order to reasonably find that the merchandise is covered by the Orders.   ArcelorMittal, 694 F.3d at 84 ("[I]f Commerce finds that the scope language is ambiguous, it then looks to . . . its regulations to determine the intended scope of the order.").

In addition to its understanding of the plain meaning of the scope language of the Orders, Commerce found that its interpretation was further confirmed by its evaluation of the sources Commerce may consider under 19 C.F.R. § 351.225(k)(1).[13]   See Remand

---

[13] Defendant claims that "[h]aving found that the scope was unambiguous as to the inclusion of unfinished Chinese OCTG, Commerce could have ended its inquiry there."  Def. Resp. 9 (citing ArcelorMittal, 694 F.3d at 84).   However, as explained above, the language of the Orders is ambiguous with respect to Chinese green tubes subsequently finished in third countries.   Thus, Defendant's claim that Commerce could have rested its scope determination solely upon its understanding of the plain language of the Orders is mistaken and Commerce was required to continue its interpretive analysis because the plain language of the Orders is ambiguous.   See A.L. Patterson, Inc. v. United States, 585 Fed. Appx. 778, 782–84 (Fed. Cir. 2014).   "Even when merchandise is facially covered by the literal language of the order, it may still be outside the scope if the order can reasonably be interpreted so as to exclude it."   Id. (internal quotations omitted).

Results 16–20.  As stated previously, Commerce's interpretation of an order must be

based upon the actual words of the order, but Commerce's regulations allow it to consider

the descriptions of the merchandise in the petition, the underlying investigation, and

determinations made by Commerce, including prior scope rulings, and the ITC to aid its

interpretive analysis.  See 19 C.F.R. § 351.225(d), (k)(1).  In considering these sources,

Commerce must not lose sight of the question of whether the Orders include the

merchandise at issue.[14]  Commerce may look to the descriptions of the merchandise

found in the sources listed under 19 C.F.R. § 351.225(k)(1) to aid in its interpretative

analysis, but the order itself "reflects the decision that has been made as to which

merchandise is within the final scope of the investigation and is subject to the order."

Duferco, 296 F.3d at 1096–97.  The inquiry ends if the descriptions of the merchandise

from these sources are dispositive.  See 19 C.F.R. § 351.225(k)(1).  In other words, for

Commerce to end its analysis at this stage, the descriptions of the merchandise from the

(k)(1) sources "must be controlling of the scope inquiry in the sense that they definitively

answer the scope question."  Sango Int'l L.P. v. United States, 484 F.3d 1371, 1379 (Fed.

Cir. 2007) (internal quotation omitted).  Here, Commerce relied upon the petition and the

ITC's injury determination from the antidumping and countervailing duty investigations.

---

[14] In Duferco, the Court of Appeals for the Federal Circuit explained that "[t]he critical question is not whether the petition covered the merchandise or whether it was at some point within the scope of the investigation" because "[t]he purpose of the petition is to propose an investigation" and the "purpose of the investigation is to determine what merchandise should be included in the final order."  Duferco, 296 F.3d at 1096.  Thus, the petition and investigation are helpful insofar as they provide insight regarding particular language in an order, not for merchandise that may have been covered by the petition and investigation, but not ultimately included in the scope of the order.

However, the evidence Commerce relied upon from these sources does not support Commerce's conclusion.

Commerce first looked to the petition from the underlying antidumping and countervailing duty investigations.  See Remand Results 16–17.  The petition described the merchandise to be investigated as

> [i]mports . . . of certain OCTG, hollow steel products of circular cross section, including only oil well casing and tubing, of iron (other than cast iron) or steel (both carbon and alloy), whether seamless or welded, whether or not conforming to American Petroleum Institute ("API") or non-API specifications, whether finished or unfinished (including green tubes and limited service OCTG products).  The scope does not cover casing or tubing containing 10.5 percent or more by weight of chromium, or drill pipe.

Investigation Petition at 5.  Regarding unfinished OCTG, specifically green tubes, the petition further provided that "OCTG may be imported in a semi-finished form known as 'green tubing' which will be subsequently processed into finished OCTG or other oil country tubular goods."  Id. at 6.  At Commerce's request, Petitioners submitted information supplementing the petition for clarification, in part, regarding the merchandise covered by the petition.  See, e.g., Petitioners' Rebuttal Comments on Preliminary Scope Ruling at Ex. 2, PD 153–54, bar codes 3145363-01–02 (Jul. 12, 2013) (response to Commerce's questionnaire regarding volume I of the petition) ("Supplement to Petition").  These supplemental submissions provided the following description of green tubes:

> Green tubes are generally classified as semi-finished pipes used to make casing and tubing products.  Like limited-service products, these pipes are typically non-API certified and require further processing to finish the pipe, however, the pipes are normally produced to API specifications.  Normally, the further processing requires that the pipes be heat treated (e.g., full length normalized and tempered, or quenched and tempered).  Often green tube is sold to a specific chemistry requirement and is often sold non-graded

and non-API certified.  However, this is not dispositive as to whether the
item is covered by the scope as casing or tubing.

Id. at 6 (internal footnote omitted).  Based upon the descriptions of the merchandise

contained within the petition and the supplemental submissions, Commerce described

the merchandise subject to the investigations as

certain oil country tubular goods (OCTG), which are hollow steel products
of circular cross-section, including oil well casing and tubing, of iron (other
than cast iron) or steel (both carbon and alloy), . . . whether finished
(including limited service OCTG products) or unfinished (including green
tubes and limited service OCTG products) . . . .

Certain Oil Country Tubular Goods from the People's Republic of China, 74 Fed. Reg. at

20,681; Oil Country Tubular Goods From the People's Republic of China, 74 Fed. Reg.

at 20,677.

Commerce claimed that its interpretation of the Orders is supported by the petition

and the supplemental submissions.  See Remand Results 16–17.  Commerce observed

that the petition and the supplemental submissions stated that "'the scope of these

petitions includes both finished and unfinished certain OCTG (i.e., semi-finished green

tubes)'" and "'[t]o sell these pipes as finished OCTG they must be further processed

through heat-treatment.'"  Id. at 17 (quoting Supplement to Petition at 13).  Based on this

observation, Commerce found that, "like the scope language itself, the petitions support

a finding that unfinished Chinese OCTG is covered by the scope of the Orders and that

the finishing process does not remove the product from the scope."  Id. (internal

quotations omitted).  The petition language Commerce relied upon explains why

Commerce should initiate an investigation for both unfinished and finished OCTG from

China, which is not in dispute here.  However, it is unclear how this language supports the inclusion of Chinese green tubes that are finished in third countries.  Commerce points to no evidence in the petition that supports this assumption.  Again, Commerce erroneously focused its inquiry on Chinese green tubes and has not answered the question of whether Chinese green tubes are nevertheless covered by the Orders if subsequently processed into finished OCTG in third countries.  Thus, the evidence Commerce relied upon from the petition does not lend support to Commerce's interpretation because it does not make any reference to third country processing of Chinese green tubes to indicate that the scope of the investigation included anything more than OCTG, both unfinished and finished, from China.

Commerce additionally claimed the ITC's final injury determination from the antidumping and countervailing duty investigations confirmed that the scope of the Orders can be reasonably interpreted to include Chinese green tubes subsequently finished in third countries.[15]  See Remand Results 18–20.  The ITC described OCTG subject to the investigation as "[s]teel pipes and tubes [that] are made in circular, rectangular, or other cross sections, and are generally manufactured by either the welded or seamless

---

[15] In interpreting the scope language of an order, Commerce may, among other sources, look to the description of the merchandise from determinations made by the ITC in an underlying antidumping or countervailing duty investigation.  See 19 C.F.R. § 351.225(k)(1).  At issue here is whether certain merchandise is covered under parallel countervailing and antidumping duty orders covering imports of certain OCTG from China.  Thus, Commerce may look to the ITC's determination in both the countervailing duty investigation and the antidumping duty investigation.  See id.  Here, however, Commerce only relied upon the ITC's determination from the countervailing duty investigation to interpret the scope language of the Orders because the ITC adopted its views from the countervailing duty investigation for its determination in the antidumping duty investigation.  See USITC Pub. 4152 at 3–4.

production process."   USITC Pub. 4124 at I-9.   The ITC further described OCTG as including "casing and tubing of carbon and alloy steel used in oil and gas wells."   Id. at I-10.  The ITC additionally described the manufacturing processes for casing and tubing, including the finishing process.   See id. at I-14–20.   The ITC described the finishing process as follows:

> The forming phase takes place entirely at the manufacturing facility or mill. Finishing, by contrast, may take place at the mill or at a processing or threading facility. . . . Subsequent to the forming phase, the pipe is heat treated, upset, and threaded.  U.S. pipe mills typically are equipped with the facilities necessary to perform these processes.  However, there are various non-pipe producers, known as processors or threaders, that can perform certain aspects of the finishing operations.   Independent processors operate facilities that are capable of full body heat treatment as well as upsetting ends. . . . According to an industry source, processors and threaders mainly serve imports since OCTG are often imported as plain ends, and are upset, threaded and heat-treated in the United States.  This approach provides distributors with the flexibility to process and thread the product in compliance with a variety of specifications, thus allowing them to serve a variety of consumer needs.

Id. at I-14–15.

Commerce claimed that although the ITC "did not explicitly discuss whether unfinished OCTG produced in China but finished in third countries would be subject to the Chinese Orders in the course of its investigations[,] . . . merchandise shipped to intermediate third countries for processing prior to importation by the United States implicitly was covered by the [ITC's] threat analysis."   Remand Results 18–19. Commerce found the ITC implicitly addressed third country processing in its threat analysis by

> consider[ing] a number of factors, including, *inter alia*, (i) any existing
> production capacity or imminent, substantial increase in production capacity
> in China; (ii) inventories of OCTG in China; (iii) exports of both finished and
> unfinished Chinese OCTG to third countries and the ability of Chinese
> producers to ship these third countries in the foreseeable future and to shift
> their third country exports to the United States; (iv) subsidies provided to
> Chinese producers with regard to their total production and exports of
> OCTG; and (v) the potential for product shifting at facilities in China.

Id. at 18 (citing USITC Pub. 4152 at 10–11, 16–27).  Commerce claimed that the above

factors considered by the ITC in the course of its injury determination support

Commerce's conclusion that OCTG finished in third countries is covered by the scope of

the Orders.  However, these considerations are routinely considered by the ITC in making

its injury determination as required by 19 U.S.C. § 1677(7)(f)(i).  By considering the

potential for Chinese producers to shift exports of subject merchandise to third countries

in the ITC's threat analysis, the ITC did not suggest or even imply that such goods are

merchandise subject to the investigations and thus subject to the Orders.[16]  The potential

increase of exports from third countries was only considered for a limited statutorily

directed purpose.  Thus, the factors considered by the ITC in determining whether a

domestic industry is threatened with material injury do not aid Commerce's interpretation

---

[16] "[W]hile the ITC determines whether there is material injury or the threat of material injury, it is
Commerce's investigation that defines the scope of the ITC's analysis."  USEC Inc. v. United
States, 34 Fed. Appx. 725, 730 (Fed. Cir. 2002).  In making its injury determination, the ITC can
determine that certain merchandise subject to the investigation does not materially injure a
domestic industry and should not be subject to antidumping or countervailing duties, but "the ITC
has no independent authority to expand the scope of an . . . investigation."  Ad Hoc Shrimp Trade
Action Comm. v. United States, 515 F.3d 1372, 1384 (Fed. Cir. 2008).

of the Orders in this case.[17]

For these reasons, Commerce's interpretation of the scope language of the Orders in consideration of the sources under 19 C.F.R. § 351.225(k)(1) is unreasonable.[18]   The evidence Commerce relied upon from the petition and the ITC's injury determination does not support Commerce's interpretation.   In fact, Commerce acknowledged that there was a "lack of any such discussion [regarding third country processing] in the Petitions and ITC Investigation, or . . . in the final scope language."   Remand Results 17.   Absent additional evidence from the descriptions of the merchandise found in the (k)(1) sources, Commerce was required to proceed to the next step of its interpretive analysis and evaluate the factors under 19 C.F.R. § 351.225(k)(2).   Therefore, the court cannot uphold Commerce's interpretation as reasonable because it is unsupported by substantial evidence.

Moreover, Commerce's interpretation of the scope language is belied by the remedy it has fashioned to implement its remand redetermination.   Commerce attempted

---

[17] Commerce's regulations provide that "in considering whether a particular product is included within the scope of an order . . . , [Commerce] will take into account . . . [t]he descriptions of the merchandise contained in . . . the determinations of . . . the Commission."   19 C.F.R. § 351.225(k)(1).   Thus, Bell argues Commerce's ability to look to the sources under 19 C.F.R. § 351.225(k)(1) in interpreting the scope of an order is limited to the descriptions of the merchandise. Bell Supply Comments 17–18.   Here, Commerce relied on context from the ITC's threat analysis because "the product description . . . neither adds to nor undermines our findings." Remand Results 19–20.   In any event, the court finds that the evidence Commerce relied upon from the ITC's injury determination does not support its interpretation of the Orders.

[18] Defendant asserts that Commerce's determination is not undermined by the petition and the ITC's injury determination.   See Def. Resp. 9–13.   However, Defendant's argument turns Commerce's interpretive analysis on its head.   It is Commerce's burden to determine whether the scope language of an order can be reasonably interpreted to include certain merchandise in light of the descriptions of the merchandise from the (k)(1) sources.

to justify its interpretation by limiting the assessment of antidumping and countervailing duties on the value of the finished OCTG that is attributable to the Chinese green tubes. See id. at 20.  If sustained, Commerce intends to require importers to submit certification of the value of the unfinished portion of the merchandise and the original producer to help identify the applicable duty rate.  See id. at 22–23.  However, if the importer is unable to provide such certification, CBP will be directed to (1) apply the PRC-wide rate to the value of the unfinished portion of the merchandise if the importer is unable to identify the original producer; (2) apply the applicable producer rate to the full value of the importer merchandise if the importer is unable to identify the value of the unfinished portion of the merchandise; or (3) apply the PRC-wide rate to the full value of the imported merchandise if the importer is unable to identify both the value of the unfinished portion of the merchandise and the original producer.   See id.   Commerce claimed that the reasonableness of its interpretation is reinforced by the fact that it has limited the remedy to the value of the finished OCTG attributable to green tubes from China.  Commerce's limitation on the imposition of duties is a consequence of Commerce's inability to conclude that OCTG finished in third countries is included within the scope of the Orders. The very remedy that Commerce has elected to implement undermines its view that the merchandise at issue, Chinese green tubes later finished in third countries, is subject merchandise.  Unless expressed otherwise in an antidumping or countervailing duty order, antidumping and countervailing duties are imposed upon the full value of merchandise subject to an order, not upon the value of an input or component used in

the production of a particular product.  Merchandise is either subject to an order or it is not.

Defendant cites to Mid Continent because the Court of Appeals for the Federal Circuit proclaimed that "just as orders cannot be extended to *include* merchandise that is not within the scope of the order as reasonably interpreted, merchandise facially covered by an order may not be *excluded* from the scope of the order unless the order can reasonably be interpreted so as to exclude it."  Def. Resp. 5 (quoting Mid Continent, 725 F.3d at 1302).  Defendant argues that Commerce's interpretation is reasonable based on this principle because it "had no basis for otherwise excluding unfinished Chinese OCTG that is facially covered by the literal terms of that scope."  Id. at 7.

The decision in Mid Continent was dictated by a question regarding a mixed media item, i.e., "otherwise-subject merchandise . . . that is packaged and imported together with non-subject merchandise."  Mid Continent, 725 F.3d at 1298.  In such situations, "Commerce is not required as a matter of law to consider components separately simply because they are packaged, sold, and advertised together."  Walgreen Co. v. United States, 620 F.3d 1350, 1356 (Fed. Cir. 2010) (citing and quoting Sango Int'l L.P. v. United States, 567 F.3d 1356, 1363 (Fed. Cir. 2009)).  The court in Mid Continent noted there may be a presumption for including a mixed media item within the scope of an order where there is no dispute that merchandise included in the item is subject merchandise. See Mid Continent, 725 F.3d at 1304.  However, Commerce did not conduct a mixed media inquiry here and the merchandise at issue is not a mixed media item.  The merchandise at issue in Mid Continent were tool kits consisting of brass-coated steel

nails, which was subject merchandise within the literal terms of an antidumping duty order on steel nails imported from China, and a variety of household tools.  See id. at 1299. The merchandise at issue here, however, is OCTG finished in a third country processed using green tubes manufactured in China.  There is no combination of subject and non-subject merchandise here.  Absent any scope language indicating otherwise, the merchandise here cannot be viewed as a mixed media item.

Notwithstanding the fact that the present case is not a mixed media inquiry, the Court of Appeals for the Federal Circuit later clarified that the presumption that a product falls within the scope of an order may only apply in a mixed media situation where certain merchandise included in a mixed media item is indisputably within the literal scope of the order.  See A.L. Patterson, Inc. v. United States, 585 Fed. Appx. 778, 783 n.3 (Fed. Cir. 2014).  Here, the notion that an input used in producing OCTG finished in third countries is subject to the Orders is hotly disputed.  While Plaintiff understands that "the scope of the Orders expressly includes both finished OCTG imported from China and unfinished OCTG, including green tubes, imported from China," Bell Supply Comments 6, Plaintiff strongly disagrees that OCTG finished in third countries is divisible into a portion that is subject merchandise and a portion that is non-subject merchandise.  See Bell Supply Comments 10–11.  Determining that Chinese green tubes are facially covered by the Orders does not settle the issue.  See A.L. Patterson, Inc., 585 Fed. Appx. at 783 ("Even when merchandise is facially covered by the literal language of the order, it may still be outside the scope if 'the order can reasonably be interpreted so as to exclude it.'") (quoting Mid Continent, 725 F.3d at 1301).

The court can only identify one instance where the imposition of antidumping or countervailing duties on the value of a component of a good has been affirmed. See Global Commodity Grp. LLC v. United States, 709 F.3d 1134 (Fed. Cir. 2013). In that case, an importer of commingled citric acid consisting of citric acid from China and other countries appealed a scope determination that found the portion of the imported merchandise consisting of citric acid from China to be within the scope of the antidumping and countervailing duty orders on citric acid and certain citrate salts from China. See id. at 1135. However, Commerce's interpretation was determined to be reasonable because the scope language of the orders in that case lent itself to the inclusion of the merchandise at issue.

In Global Commodity, the scope of the orders covered "all grades and granulation sizes of citric acid, . . . .and . . . also includes blends of citric acid." Id. at 1135 (internal quotations omitted). Commerce found that the imported merchandise was "commingled citric acid, and for all intents and purposes, commingled citric acid is still just citric acid. Functionally and chemically, it is indistinguishable from citric acid that comes from a single source." Id. at 1137 (internal quotations omitted). While the scope of the Orders here covers both unfinished and finished OCTG from China, Commerce's interpretation of the Orders to include Chinese green tubes subsequently finished in third countries is not reasonable in light of the scope language and Commerce's findings from the (k)(1) sources. Unfinished and finished OCTG are not one in the same. The imported merchandise here is OCTG finished in countries other than China and the United States, not green tubes manufactured in China. However, the imported merchandise in Global

Commodity remained citric acid.  Because the language of the Orders is ambiguous, Commerce was required to make findings supported by substantial evidence that OCTG finished in third countries using Chinese green tubes, not Chinese green tubes alone, are covered by the Orders.  Commerce has not done so.

The specific instruction given by the court in Bell was "[o]n remand Commerce must identify actual language from the scope of the Orders that could be reasonably interpreted to include OCTG finished in third countries in order to find that the merchandise is covered by the scope of the Orders."  Bell, 39 CIT at __, 83 F. Supp. 3d at 1329.  Commerce has not done that.  While Commerce may have identified actual language from the scope of the Orders, the identified scope language cannot be said to unambiguously include the merchandise at issue.  Additionally, Commerce's interpretation of the scope language pursuant to its assessment of the sources under 19 C.F.R. § 351.225(k)(1) cannot be viewed as reasonable because the evidence relied upon does not support the conclusion that the Orders cover Chinese green tubes that are subsequently finished in third countries.

On remand, Commerce must identify evidence from the descriptions of the merchandise in the (k)(1) sources to reasonably interpret the scope language of the Orders to cover Chinese green tubes finished in third countries.  If the descriptions of the merchandise in the (k)(1) sources are not dispositive, then Commerce must proceed to evaluate the factors under 19 C.F.R. § 351.225(k)(2) as directed by its regulations.  If Commerce is unable to find that the scope of the Orders cover the merchandise at issue under the (k)(2) factors, then the merchandise is not within the scope of the Orders.  In

the event Commerce determines that the merchandise at issue falls outside the scope of the Orders, Commerce is also free to employ a circumvention analysis pursuant to 19 C.F.R. § 351.225(h) and 19 U.S.C. § 1677j(b) to bring the merchandise within the reach of the Orders because the scope language does not expressly exclude Chinese green tubes that are finished in a foreign third country.  See 19 U.S.C. § 1677j(b); 19 C.F.R. § 351.225(h) (instructing Commerce that an analysis pursuant to 19 U.S.C. § 1677j(b) is applicable where products are completed or assembled in foreign countries); see also Deacero S.A. De C.V. v. United States, __ F.3d __, __–__, Appeal Nos. 2015-1362–63, 2015-1367, at *4–5 (Fed. Cir. Apr. 5, 2016) (citing Wheatland Tube Co., 161 F.3d at 1369–70).  Or, Commerce can forego a circumvention inquiry and determine that Chinese green tubes subsequently finished in countries other than the United States and China fall outside the scope of the Orders.

## CONCLUSION

For the reasons discussed above, the Remand Results do not comply with the court's remand order in Bell, are not supported by substantial evidence, and are otherwise not in accordance with law.  Therefore, in accordance with the foregoing, it is hereby

**ORDERED** that Commerce's remand redetermination is remanded for further consideration consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its second remand redetermination with the court within 60 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments on the second remand redetermination; and it is further

**ORDERED** that the parties shall have 15 days to file their replies to comments on the second remand redetermination.

 /s/ Claire R. Kelly
Claire R. Kelly, Judge

Dated: April 27, 2016
          New York, New York