Slip Op. 16-109

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **BELL SUPPLY COMPANY, LLC,** | |
| **Plaintiff,** | |
| **v.** | Before: Claire R. Kelly, Judge |
| **UNITED STATES,** | Court No. 14-00066 |
| **Defendant,** | PUBLIC VERSION |
| **and** | |
| **BOOMERANG TUBE LLC ET AL.,** | |
| **Defendant-Intervenors.** | |

## <u>OPINION</u>

[Second Remand Results sustained.]

Dated: November 23, 2016

<u>Donald Bertrand Cameron</u>, <u>Julie Clark Mendoza</u>, <u>Rudi Will Planert</u>, <u>Brady Warfield Mills</u>, <u>Mary Shannon Hodgins</u>, and <u>Sarah Suzanne Sprinkle</u>, Morris, Manning & Martin, LLP, of Washington, DC, for plaintiff.

<u>Loren Misha Preheim</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With him on the brief were <u>Benjamin C. Mizer</u>, Principal Deputy Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Claudia Burke</u>, Assistant Director. Of counsel on the brief was <u>Whitney Marie Rolig</u>, Senior Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Roger Brian Schagrin</u>, <u>Christopher Todd Cloutier</u>, <u>John Winthrop Bohn</u>, <u>Jordan Charles Kahn</u>, and <u>Paul Wright Jameson</u>, Schagrin Associates, of Washington, DC, for defendant-intervenors Boomerang Tube LLC, TMK IPSCO Tubulars, V&M Star L.P., and Wheatland Tube Company.

Robert Edward DeFrancesco, III and Alan Hayden Price, Wiley Rein, LLP, of Washington, DC, for defendant-intervenor Maverick Tube Corporation.

Debbie Leilani Shon, Jon David Corey, Jonathan Gordon Cooper, and Josef Teboho Ansorge, Quinn Emanuel Urquhart & Sullivan, LLP, of Washington, DC, for defendant-intervenor United States Steel Corporation.

Kelly, Judge:   Before the court is the U.S. Department of Commerce's ("Commerce" or "Department") second remand redetermination filed pursuant to the court's order in Bell Supply Co. v. United States, 40 CIT __, Slip Op. 16-41 (Apr. 27, 2016) ("Bell Supply II") for a remand to Commerce for further consideration of Commerce's findings in Final Results of Redetermination Pursuant to Remand, Nov. 9, 2015, ECF No. 88-1 ("First Remand Results").  See Final Results of Second Redetermination Pursuant to Remand, Aug. 11, 2016, ECF No. 132-1 ("Second Remand Results").

The court reviews Commerce's determinations: (1) that unfinished green tubes[1] manufactured in China and subsequently finished in third countries into oil country tubular goods ("OCTG") are not within the scope of the antidumping and countervailing duty orders covering certain OCTG from the People's Republic of China ("PRC" or "China"); and (2) that OCTG finished in Indonesia from Chinese unfinished green tubes do not circumvent antidumping and countervailing duty orders covering OCTG from China.  See Second Remand Results; see also Certain Oil Country Tubular Goods From the People's Republic of China, 75 Fed. Reg. 3,203 (Dep't Commerce Jan. 20, 2010) (amended final affirmative countervailing duty determination and countervailing duty order) ("CVD Order"); Certain Oil Country Tubular Goods From the People's Republic of China, 75 Fed.

---

[1] In the Second Remand Results, Commerce refers to the unfinished product leaving China for Indonesia at issue in this case as "green tubes," "unfinished green tubes," "unfinished OCTG," "unfinished OCTG (including green tubes)," and "unfinished OCTG (e.g., green tubes)."  For ease of reference, the court adopts the term "unfinished green tubes" throughout this opinion to refer to the unfinished Chinese product imported to Indonesia for processing into finished OCTG.

Reg. 28,551 (Dep't Commerce May 21, 2010) (amended final determination of sales at less than fair value and antidumping duty order) ("ADD Order").  The court sustains Commerce's determinations because Commerce has complied with the court's order in Bell Supply II and Commerce's conclusions are supported by substantial evidence.

## BACKGROUND

The court assumes familiarity with the facts of this case as set out in its two previous opinions.  See Bell Supply Company, LLC v. United States, 39 CIT __, 83 F. Supp. 3d 1311 (2015) ("Bell Supply I"); Bell Supply II, 40 CIT __, Slip Op. 16-41. Nonetheless, some facts directly relevant to reviewing Commerce's Second Remand Results bear repeating.

On January 20, 2010 and May 21, 2010, respectively, Commerce published the countervailing and antidumping duty orders on OCTG from the PRC.  See CVD Order, 75 Fed. Reg. at 3,203, ADD Order, 75 Fed. Reg. at 28,551.  The CVD and ADD Orders (collectively "Orders") define the subject merchandise as:

> certain oil country tubular goods ("OCTG"), which are hollow steel products of circular cross-section, including oil well casing and tubing, of iron (other than cast iron) or steel (both carbon and alloy), whether seamless or welded, regardless of end finish (e.g., whether or not plain end, threaded, or threaded and coupled) whether or not conforming to American Petroleum Institute ("API") or non-API specifications, whether finished (including limited service OCTG products) or unfinished (including green tubes and limited service OCTG products), whether or not thread protectors are attached. The scope of the order also covers OCTG coupling stock. Excluded from the scope of the order are: casing or tubing containing 10.5 percent or more by weight of chromium; drill pipe; unattached couplings; and unattached thread protectors.

CVD Order, 75 Fed. Reg. at 3,203–04; ADD Order, 75 Fed. Reg. at 28,553.

On June 20, 2012, Commerce initiated a scope inquiry regarding Plaintiff's merchandise following a request from Defendant-Intervenors United States Steel

Corporation ("U.S. Steel"), TMK IPSCO, Wheatland Tube Company, Boomerang Tube

LLC, and V&M Star L.P.[2]  See Initiation of Scope Inquiry, PD 25, bar codes 3082712-01,

3082735-01 (June 21, 2012).[3]

On February 7, 2014, Commerce issued a final scope ruling determining that

unfinished green tubes manufactured in China processed into finished OCTG in third

countries are subject to the Orders because such merchandise is not substantially

transformed during the finishing process.   See Final Scope Ruling on Green Tubes

Manufactured in the People's Republic of China and Finished in Countries Other than the

United States and the People's Republic of China, May 14, 2014, ECF No. 31-1 ("Final

Scope Ruling"); see also 19 C.F.R. § 351.225(e) (2013).[4]

Plaintiff challenged the Final Scope Ruling in this court, arguing that Commerce's

determination unlawfully expanded the scope of the Orders and relied on a substantial

transformation analysis unsupported by substantial evidence and otherwise not in

accordance with law.  Compl. ¶¶ 21, 25, Apr. 4, 2014, ECF No. 8; see Bell Supply I, 39

CIT at __, 83 F. Supp. 3d at 1313–14.  The court held that Commerce failed to follow the

interpretive framework established in its regulations and therefore unlawfully expanded

the scope of the Orders to include Plaintiff's merchandise.  See Bell Supply I, 39 CIT at

__, 83 F. Supp. 3d at 1328–30.  The court remanded Commerce's scope determination

---

[2] As explained in Bell Supply II, Defendant-Intervenors requested the scope ruling in response to a U.S. Customs and Border Protection ruling that green tubes and unfinished seamless steel pipes made in India, China, or Russia subsequently heat treated in certain third countries became products of that third country.  See Bell Supply II, 40 CIT at __, Slip Op. 16-41 at 6.

[3] On May 14, 2014, Commerce submitted indices to the confidential and public administrative records for its antidumping and countervailing duty scope proceedings.  Those administrative records can be found at ECF Nos. 31-4 and 31-5, respectively.  All further documents from the administrative records may be located in those appendices unless otherwise noted.

[4] Further citations to Title 19 of the Code of Federal Regulations are to the 2013 edition.

with instructions to "identify actual language from the scope of the Orders that could be reasonably interpreted to include OCTG finished in third countries in order to find that the merchandise is covered by the scope of the Orders," as required pursuant to the regulatory scheme. Id. at 1329.

On first remand,[5] Commerce determined that the plain language of the Orders covered unfinished green tubes manufactured in China, regardless of whether the tubes are subsequently finished into OCTG in third countries. See First Remand Results at 2, 15, 20.    After reviewing comments from Plaintiff and replies from Defendant and Defendant-Intervenors, the court determined that Commerce's First Remand Results did not comply with the court's remand order in Bell Supply I and that the results were not supported by substantial evidence or in accordance with law.    Bell Supply II, 40 CIT at __, Slip Op. 16-41 at 11, 13, 38–40.  Specifically, the court held that Commerce did not comply with the court's instruction that it must identify language in the Orders that could be reasonably interpreted to include OCTG finished in third countries, prior to finding that OCTG finished in third countries is within the Orders' scope. Id. at 38 (citing Bell Supply I, 39 CIT at __, 83 F. Supp. 3d at 1329).  Although Commerce did identify actual language that appeared in the scope of the Orders, the court held the language was insufficient to permit Commerce to determine that the Orders unambiguously include OCTG finished in third countries.  Bell Supply II, 40 CIT at __, Slip Op. 16-41 at 38.  The court further held

---

[5] Commerce conducted the first remand redetermination under protest, noting that it "respectfully disagree[d] with the CIT that the Department improperly conducted a 'substantial transformation' test in this proceeding."  First Remand Results at 14.  By adopting a position "under protest," Commerce preserved its right to appeal; the Federal Circuit has held that Commerce preserves its right to appeal in instances where Commerce makes a determination under protest and the Court of International Trade sustains its decision after remand.  See Viraj Grp., Ltd. v. United States, 343 F.3d 1371, 1376 (Fed. Cir. 2003).

that Commerce's interpretation of the scope language of the Orders was unsupported by

substantial evidence because Commerce did not identify evidence from the 19 C.F.R.

§ 351.225(k)(1) sources to support its interpretation.  Id., 40 CIT at __, Slip Op. 16-41 at

33.  The court also held that, to the extent that the scope language remained ambiguous

following consultation of the (k)(1) sources, Commerce did not evaluate the factors under

19 C.F.R. § 351.225(k)(2), as required by its regulation.  Id., 40 CIT at __, Slip Op. 16-41

at 38–39.   The court remanded Commerce's redetermination again for further

consideration and instructed that, on second remand, Commerce

> must identify evidence from the descriptions of the merchandise in the (k)(1)
> sources to reasonably interpret the scope language of the Orders to cover
> Chinese green tubes finished in third countries.  If the descriptions of the
> merchandise in the (k)(1) sources are not dispositive, then Commerce must
> proceed to evaluate the factors under 19 C.F.R. § 351.225(k)(2) as directed
> by its regulations.  If Commerce is unable to find that the scope of the Orders
> cover the merchandise at issue under the (k)(2) factors, then the
> merchandise is not within the scope of the Orders.  In the event Commerce
> determines that the merchandise at issue falls outside the scope of the
> Orders, Commerce is also free to employ a circumvention analysis pursuant
> to 19 C.F.R. § 351.225(h) and 19 U.S.C. § 1677j(b) to bring the
> merchandise within the reach of the Orders because the scope language
> does not expressly exclude Chinese green tubes that are finished in a
> foreign third country.  Or, Commerce can forego a circumvention inquiry and
> determine that Chinese green tubes subsequently finished in countries
> other than the United States and China fall outside the scope of the Orders.

Id., 40 CIT at __, Slip Op. 16-41 at 38–39 (internal citations omitted).

On August 11, 2016, Commerce issued the Second Remand Results, in which

Commerce determined that the language of the Orders does not include unfinished green

tubes manufactured in China and finished in third countries and that imports of finished

OCTG from Indonesia processed from unfinished green tubes from China do not

circumvent the Orders.  See Second Remand Results at 1, 5, 19–20, 33–35.  On

September 19, 2016, Defendant-Intervenors U.S. Steel and Maverick filed comments to

the Second Remand Results, see U.S. Steel Comments On Final Results of Second

Redetermination, Sept. 19, 2016, ECF No. 147 ("U.S. Steel Comments"); Def.-Intervenor

Maverick Comments On Final Results of Second Redetermination, Sept. 19, 2016, ECF

No. 148 ("Maverick Comments"), to which Plaintiff replied.  Pl. Rebuttal Comments on

Second Redetermination, Sept. 26, 2016, ECF No. 149 ("Pl. Rebuttal").

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over Plaintiff's claim under section 516A of the Tariff Act

of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(vi) (2012)[6] and 28 U.S.C. § 1581(c)

(2012), which grant the court authority to review actions contesting scope determinations

that find certain merchandise to be within the class or kind of merchandise described in

an antidumping or countervailing duty order.   The court must "hold unlawful any

determination, finding, or conclusion found . . . to be unsupported by substantial evidence

on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i).

"The results of a redetermination pursuant to court remand are also reviewed 'for

compliance with the court's remand order.'"   Xinjiamei Furniture (Zhangzhou) Co. v.

United States, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014) (quoting Nakornthai

Strip Mill Public Co. v. United States, 32 CIT 1272, 1274, 587 F. Supp. 2d 1303, 1306

(2008)).

## DISCUSSION

The court first reviews Commerce's determination that the subject merchandise,

which is produced in China and subsequently processed in third countries, is not covered

by the Orders.   The court then reviews Commerce's negative anti-circumvention

---

[6] Further citations to the Tariff Act of 1930, as amended, are to the relevant portions of Title 19 of
the U.S. Code, 2012 edition.

determination under 19 U.S.C. § 1677j(b).  For the reasons that follow, Commerce has

complied with the court's remand instructions in <u>Bell Supply II</u> and both Commerce's

scope analysis and its anticircumvention determinations are supported by substantial

evidence.

**I.  Commerce's Scope Analysis Is Supported By Substantial Evidence**

In the Second Remand Results, Commerce reexamined the language of the

Orders and determined that neither the plain language nor the language read in

conjunction with the sources outlined in 19 C.F.R. § 351.225(k)(1) indicates that

unfinished green tubes manufactured in China and subsequently finished in Indonesia, a

third country, are covered by the Orders.   Second Remand Results at 14–15.   After

consulting the factors outlined in 19 C.F.R. § 351.225(k)(2), Commerce also determined

that none of the (k)(2) factors indicates whether unfinished green tubes manufactured in

China and subsequently finished in Indonesia are within the scope of the Orders.  <u>Id.</u> at

19; <u>see</u> 19 C.F.R. § 351.225(k)(2).  Accordingly, Commerce determined that the imported

merchandise is not covered by the scope of the Orders.  Second Remand Results at 19.

The court finds this determination is supported by substantial evidence.

Commerce's regulations permit it to conduct a scope inquiry when necessary to

clarify the scope of an antidumping or countervailing duty order.   <u>See</u> 19 C.F.R.

§ 351.225(b)–(c).  Where Commerce conducts a scope inquiry, it looks to the words of

the order to ascertain if the plain meaning of the scope language is unambiguous with

respect to the merchandise in question.  19 C.F.R. § 351.225(k)(1); <u>see</u> <u>Duferco Steel,</u>

<u>Inc. v. United States</u>, 296 F.3d 1087, 1097 (Fed. Cir. 2002).  Although Commerce enjoys

broad discretion "to interpret and clarify its antidumping duty orders," <u>Ericsson GE Mobile</u>

Commc'ns, Inc. v. United States, 60 F.3d 778, 782 (Fed. Cir. 1995) (internal citations

omitted), Commerce must point to "language that specifically includes the subject

merchandise or may be reasonably interpreted to include it." Duferco Steel, Inc., 296

F.3d at 1089.  Merchandise is not within the scope of an order unless it is demonstrated

to be unambiguously covered by that order.  Id. at 1096.  If the language is ambiguous

as to the subject merchandise, Commerce may clarify the words of the order by analyzing

the descriptions of the merchandise found in the petition, the investigation, and past

scope rulings and injury determinations.  See 19 C.F.R. § 351.225(k)(1).  If the sources

consulted pursuant to 19 C.F.R. § 351.225(k)(1) do not clarify the meaning of the scope

language, Commerce analyzes the physical characteristics of the product, the

expectations of the ultimate purchasers, the ultimate use of the product, the channels of

trade in which the product is sold, and the manner in which the product is advertised and

displayed, to determine if the product is covered by the order.  See 19 C.F.R.

§ 351.225(k)(2).

On second remand, Commerce determined that neither the plain language nor the

language read in conjunction with the (k)(1) sources supports a finding that unfinished

green tubes manufactured in China and subsequently finished in Indonesia are within the

scope of the Orders.  Second Remand Results at 14–15.  Commerce thus analyzed the

19 C.F.R. § 351.225(k)(2) factors and concluded that none of the (k)(2) factors clarifies

whether unfinished green tubes originating in China and processed in Indonesia into

finished OCTG remain products of China.[7]  Id. at 15–19.  As none of the factors squarely

---

[7] After a review of each (k)(2) factor, Commerce determined that the (k)(2) factors do not
conclusively establish that unfinished green tubes imported from China and further processed in

(footnote continued)

addresses the issue of third country production, Commerce reasonably found that nothing

in the record unambiguously evidenced that the merchandise finished in Indonesia is

within the scope of the Orders.  Id. at 19; see Duferco Steel, Inc., 296 F.3d at 1096.

Where the record does not include information to conclusively indicate that unfinished

green tubes originating in China and further processed in Indonesia should be considered

Chinese OCTG, Commerce reasonably determined such unfinished green tubes are not

covered by the Orders.

Defendant-Intervenors Maverick and U.S. Steel argue that Commerce's scope

determinations in the Final Scope Ruling and First Remand Results were supported by

substantial evidence and in accordance with law.[8]  U.S. Steel Comments at 2–3; Maverick

Comments at 3–4.  Defendant-Intervenors' arguments were addressed by the court in its

previous remand decisions.[9]     Accordingly,   Defendant-Intervenors'   arguments   that

---

Indonesia are subject to the Orders.   Second Remand Determination at 19.   Commerce
acknowledged that physical characteristics, expectations of the ultimate purchaser, ultimate use,
and marketing and display of Chinese unfinished green tubes finished in Indonesia are identical
or substantially similar to finished and unfinished OCTG produced entirely in China.   Id.
Commerce further noted that, while there may be different applications for finished, heat-treated
tube and unfinished green tube, the applications for both products are variations on the extraction
of oil and gas.   Id.   However, Commerce found that Chinese unfinished green tubes finished in
Indonesia differ on one (k)(2) factor, channels of trade, "in that the unfinished OCTG
manufactured in the PRC must first pass through a third country and undergo heat treatment prior
to importation into the United States."  Id.  at 19.

[8] Neither Maverick nor U.S. Steel contends that Commerce's analysis in the Second Remand
Results were not supported by substantial evidence or contrary to law.  Rather, both Maverick
and U.S. Steel preserve for appeal their claims that Commerce's original final scope ruling and
Commerce's First Remand Results were lawful and supported by substantial evidence.  Maverick
Comments at 3; U.S. Steel Comments at 2.  Additionally, U.S. Steel incorporates by reference
their previous arguments and those of other domestic producers that Commerce's substantial
transformation analysis in the final determination and scope analysis in the First Remand Results
were supported by substantial evidence.  U.S. Steel Comments at 2.

[9] In Bell I, the court held that Commerce failed to follow the interpretive framework established in
its regulations on scope determinations or anticircumvention.  Bell Supply I, 39 CIT at __, 83 F.
Supp. 3d. at 1328 ("It is unclear to the court why Commerce believed that the (k)(1) and (k)(2)

(footnote continued)

Commerce's determinations in the Final Scope Ruling and First Remand Results were

supported by substantial evidence and in accordance with law continue to fail.

## II. Commerce's Circumvention Analysis Is Supported By Substantial Evidence

As Commerce was unable to determine under a scope analysis that Chinese

unfinished green tubes finished in Indonesia are covered by the Orders, Commerce

proceeded to conduct a circumvention analysis pursuant to 19 U.S.C. § 1677j(b) to

determine whether merchandise otherwise not subject to the Orders should be

considered subject merchandise.  See 19 U.S.C. § 1677j(b)(1)–(3).

To find circumvention, Commerce must determine that:

(A) merchandise imported into the United States is of the same class or kind
as any merchandise produced in a foreign country that is the subject
of—
   (i)  antidumping duty order . . .,
(B) before importation into the United States, such imported merchandise is
completed or assembled in another foreign country from merchandise
which--
   (i)  is subject to such order or finding, or
   (ii) is produced in the foreign country with respect to which
        such order or finding applies,
(C) the process of assembly or completion in the foreign country referred to
in subparagraph (B) is minor or insignificant,
(D) the value of the merchandise produced in the foreign country to which
the antidumping duty order applies is a significant portion of the total
value of the merchandise exported to the United States, and

---

factors provided for in its own regulations were not useful in answering the interpretive question
before it.  .  .  .  Whatever reason Commerce had for abandoning an interpretive approach in
conducting its scope inquiry, it acted contrary to law when it did so.").  The court also held that
Commerce improperly read the Orders' silence regarding OCTG finished in third countries as
indicating that merchandise processed in third countries was included.  Id., 39 CIT at __, 83 F.
Supp. 3d at 1328–29.  In Bell II, the court held that Commerce, in its remand redetermination,
failed to identify language in the Orders and identify sources that permitted it to reasonably
interpret the Orders to reach Plaintiffs' merchandise.  Bell Supply II, 40 CIT at __, Slip Op. 16-41
at 38–40.  Finally, the court determined that, because the (k)(1) sources were not dispositive,
Commerce should have proceeded to evaluate the factors under 19 C.F.R. § 351.225(k)(2).  Id.,
40 CIT at __, Slip Op. 16-41 at 33, 38–39.

    (E) [Commerce] determines that action is appropriate under this paragraph
        to prevent evasion of such order or finding.

19 U.S.C. § 1677j(b)(1).

      Whether the "process of assembly or completion in the foreign country . . . is minor or insignificant" is evaluated pursuant to factors provided in 19 U.S.C. § 1677j(b)(2).[10] Specifically, Commerce considers the levels of investment and degree of research and development in the third country, the nature of the production processes and the extent of the production facilities in the third country, and the value added from the processing performed in the third country.  19 U.S.C. § 1677j(b)(2).

      Finally, in making a determination whether to include merchandise assembled or completed in a third country within an order, Commerce considers the additional factors listed under 19 U.S.C. § 1677j(b)(3), which are

    (A) the pattern of trade, including sourcing patterns,
    (B) whether the manufacturer or exporter of the merchandise described in
        paragraph (1)(B) is affiliated with the person who uses the merchandise
        described in paragraph (1)(B) to assemble or complete in the foreign
        country the merchandise that is subsequently imported into the United
        States, and
    (C) whether imports into the foreign country of the merchandise described
        in paragraph (1)(B) have increased after the initiation of the investigation
        which resulted in the issuance of such order or finding.

19 U.S.C. § 1677j(b)(3).

      Here, after finding that the finished OCTG imported into the United States is of the same class or kind as the Chinese merchandise subject to the Orders, 19 U.S.C. § 1677j(b)(1)(A), and that it is "completed or assembled in another foreign country from

---

[10] When Commerce assesses the 19 U.S.C. § 1677j(b)(2) factors, no one factor is controlling.  19 C.F.R. 351.225(h).

merchandise . . . subject to such order" prior to importation into the United States, 19

U.S.C. § 1677j(b)(1)(B), Commerce considered whether the process of assembly or

completion in Indonesia is minor or insignificant pursuant to § 1677j(b)(1)(C).  Second

Remand Results at 22–29.  Commerce applied the 19 U.S.C. § 1677j(b)(2) factors.  It

found that the Indonesian processing operations comprise eight-steps, including heat

treatment, proprietary threading, coupling, logistics, and warehousing, id. at 25, 28, and

add a significant proportion of the value of the merchandise imported to the United States.

Id. at 26.  Commerce determined that significant quantitative value is added, based on

Commerce's finding that the weighted-average value added by the Indonesian heat

treatment process is a certain percentage[11] of the final value of the finished OCTG.  Id.

at 26, 29.  Commerce also determined that it was appropriate to consider the total value

added to the merchandise by all of the finishing operations performed in Indonesia, and

subsequently found that the total value added by the finishing processes in Indonesia is

not small or insignificant.[12]  Id. at 26, 29.  Commerce found that the finishing operations

also add qualitative value, as finishing renders unfinished green tubes "suitable for

particular applications."[13]  Id. at 26.  Based on these findings, Commerce concluded that

---

[11] Commerce found that the Indonesian heat treatment process comprises approximately [[      ]] percent of the final value of the finished OCTG.  Second Remand Results at 26, 29.

[12] Commerce considered the calculations provided by Plaintiff showing that the total value added by all of the finishing operations is approximately [[   ]] percent of the final value of the finished OCTG.  Second Remand Results at 26, 29.  Commerce noted that the value calculations provided by Plaintiff were not based on surrogate value estimates of Chinese unfinished green tubes as is Commerce's usual practice in valuing merchandise in anticircumvention proceedings, but rather based on the average prices of unfinished green tubes purchased by the Indonesian entity from European mills as surrogate value information was not available on the record.  Id. at 29.  Ultimately, Commerce concluded that "the processing performed in Indonesia does not represent a small proportion of the value of the merchandise imported into the United States."  Id. at 34.

[13] Regarding each of the other (b)(2) factors, Commerce found that the levels of investment in

(footnote continued)

the nature and extent of the finishing operations performed in Indonesia go beyond "mere finishing or assembly" and are therefore neither minor nor insignificant.[14] Id. at 26–29.

No party challenges Commerce's finding that the process of completion or assembly in Indonesia is neither minor nor insignificant. Commerce based its determination on sufficient record evidence regarding the nature and extent of the processing operations in Indonesia and the value added by those processing operations. Commerce identified record evidence regarding the Indonesian finishing processes that involve multiple steps, including the heat treatment process which contributes a certain percentage[15] to the finished product's value. Id. at 26, 29. Commerce also considered the significant additional value added to the product by the entire finishing process. Id. at 26, 29. Processing that involves multiple steps and contributes a significant portion of the

---

Indonesia were relatively insignificant, as the total investment in the Indonesian processing facility is [[  ]] percent of the total investment required for a complete, fully integrated seamless pipe mill, "the existence of which is necessary in the production of OCTG." Second Remand Results at 27. Although Commerce found that record evidence indicated the Indonesian entity "continues to research and develop proprietary threading processes," Commerce determined it could not quantify the level of research and development in Indonesia so that factor did not indicate whether the processing operations in Indonesia were minor or insignificant. Id. at 27–28.

[14] Commerce reached a different conclusion on the 19 U.S.C. § 1677j(b)(2) factors in the Draft Remand Redetermination, and found that the finishing processes in Indonesia are minor or insignificant and thus that circumvention was occurring. See Draft Results of Second Remand Redetermination Pursuant to Remand, Nov. 3, 2016, ECF No. 153-1 at 13–19. Specifically, Commerce preliminarily found that the heat treatment performed in Indonesia constitutes "a small portion of the overall production process of OCTG" and is "essentially one step in a multi-step process of creating finished OCTG." Id. at 18. Commerce also focused only on the value added by the heat treatment process, id. at 17–19, and preliminarily found that the quantitative value added by the Indonesian processing is "relatively small." Id. at 17. Commerce thus preliminarily found that insignificant qualitative value was added by the finishing process. Id. 17–19.
  In the final Second Remand Results, Commerce reached a different conclusion on the evidence because Commerce considered the finishing process to be a multi-step process that significantly alters the product, Second Remand Results at 25, 28, and took account of the value added by the finishing process in its entirety rather than only heat treatment, and determined that the total value added is significant. Id. at 26, 29.

[15] Commerce found that the Indonesian heat treatment process comprises approximately [[    ]] percent of the final value of the finished OCTG. Second Remand Results at 26, 29.

value to a final product is extensive and significant; such processes cannot simultaneously be minor or insignificant.  Commerce's determination that the assembly or completion in Indonesia was not minor or insignificant, and thus that 19 U.S.C. § 1677j(b)(1)(C) was not satisfied, is reasonable.[16]

Commerce reasonably determined that the record did not support a finding of circumvention because the process of assembly in Indonesia was not minor or insignificant.  Commerce determined that the merchandise should not be included in the Orders pursuant to the anticircumvention statute as not all factors under 19 U.S.C. § 1677j(b)(1) suggested that circumvention was occurring as is required for an affirmative circumvention finding under the statute, and the 19 U.S.C. § 1677j(b)(3) factors did not indicate circumvention in the absence of a finding on 19 U.S.C. § 1677j(b)(1).  Id. at 33–

---

[16] Having found that processing in Indonesia was not minor or insignificant, Commerce evaluated whether the value of the merchandise produced in China is a significant portion of the total value of the merchandise exported to the United States.  See 19 U.S.C. § 1677j(b)(1)(D).  Commerce found that unfinished green tubes produced in China contribute approximately [[    ]] percent of the total value of the merchandise exported to the United States, which Commerce determined was a significant portion.  Second Remand Results at 29, 34.  Commerce did not evaluate whether action is appropriate to prevent evasion of the Orders; reaching this question was unnecessary in light of Commerce's determination that the process of assembly or completion in Indonesia is not minor or insignificant.

Although Commerce did not find circumvention under its 19 U.S.C. § 1677j(b)(1) analysis, Commerce proceeded to analyze the additional factors under 19 U.S.C. § 1677j(b)(3) as required by statute.  Commerce found that evidence on the record demonstrates that: imports into Indonesia of Chinese unfinished green tubes increased from 47,000 metric tons in 2008 to over 76,000 metric tons in 2011; imports into the United States of all OCTG from China decreased from nearly two million metric tons in 2008 to over 11,000 metric tons in 2011; and imports into the United States of OCTG from Indonesia increased from zero in 2008 to over 41,000 metric tons in 2011.  Second Remand Results at 31–33; see also 19 U.S.C. § 1677j(b)(3).  Although Commerce found a change in patterns of trade and an increase of imports of Chinese unfinished green tubes into Indonesia after the investigation, Second Remand Results at 34, Commerce determined that the Indonesian entity performing the processing functions is not affiliated with any Chinese producer or supplier of unfinished green tubes.  Id. at 32.  Commerce emphasized that it generally considers circumvention more likely when such affiliation is present.  Id.  As such, Commerce determined that the (b)(3) factors could not, on their own, support a finding that circumvention is occurring.  See id. at 34.  Commerce's logic is reasonable.

**PUBLIC VERSION**

34; <u>see also</u> 19 U.S.C. §§ 1677j(b)(1), (b)(3).  No party points to any record evidence undermining or detracting from Commerce's conclusion.  Nor does any party challenge Commerce's circumvention analysis.  Commerce reasonably determined that it could not affirmatively find that circumvention is occurring.

**CONCLUSION**

For the foregoing reasons, the results of Commerce's second remand redetermination are found to comply with the court's remand order in <u>Bell Supply II</u>, are supported by substantial evidence, and are in accordance with law.  Therefore, the court sustains the Second Remand Results.  Judgment will enter accordingly.

　　　　　　　　　　　　　　　　　 /s/ Claire R. Kelly　
　　　　　　　　　　　　　　　　　Claire R. Kelly, Judge

Dated: November 23, 2016
　　　　New York, New York