Slip Op. 18-141

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **BELL SUPPLY COMPANY, LLC,** | |
| **Plaintiff,** | |
| **v.** | |
| **UNITED STATES,** | **Before: Claire R. Kelly, Judge** |
| **Defendant,** | **Court No. 14-00066** |
| **and** | **PUBLIC VERSION** |
| **BOOMERANG TUBE LLC ET AL.,** | |
| **Defendant-Intervenors.** | |

### OPINION AND ORDER

[Remanding the U.S. Department of Commerce's Final Scope Ruling on Green Tubes Manufactured in the People's Republic of China and Finished in Countries other than the United States and the People's Republic of China.]

Dated: October 18, 2018

Donald Bertrand Cameron, Julie Clark Mendoza, Rudi Will Planert, Brady Warfield Mills, and Mary Shannon Hodgins, Morris, Manning & Martin, LLP, of Washington, DC, for plaintiff.

Agatha Koprowski, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With her representing the Defendant were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Loren Misha Preheim, Assistant Director.

Roger Brian Schagrin, Schagrin Associates, of Washington, DC, for defendant-intervenors Boomerang Tube LLC, TMK IPSCO Tubulars, V&M Star L.P., and Wheatland Tube Company.

Robert Edward DeFrancesco, III, and Alan Hayden Price, Wiley Rein, LLP, of Washington, DC, for defendant-intervenor Maverick Tube Corporation.

<u>Thomas M. Beline</u>, Cassidy Levy Kent (USA) LLP, of Washington, DC, for defendant-intervenor United States Steel Corporation.

Kelly, Judge:   This case is on remand from the U.S. Court of Appeals for the Federal Circuit.   The Court of Appeals vacated and remanded this court's decision in <u>Bell Supply Co., LLC v. United States</u>, 39 CIT __, 83 F. Supp. 3d 1311 (2015) ("<u>Bell Supply I</u>"), which held that section 781 of the Tariff Act of 1930, 19 U.S.C. § 1677j (2012), precluded the U.S. Department of Commerce's ("Department" or "Commerce") use of a "substantial transformation test" to determine whether certain oil country tubular goods ("OCTG") originated in the People's Republic of China ("PRC" or "China") and was subject to the antidumping order on OCTG from China.[1]   As a result, the sole issue before the court is whether Commerce's application of its substantial transformation test is supported by substantial evidence.   In both its Preliminary and Final Scope Rulings, Commerce found that seamless unfinished OCTG produced in China and finished in third countries had not undergone a substantial transformation, and is thus within the scope of the antidumping and countervailing duty orders on OCTG from China.   <u>See</u> Preliminary Scope Ruling on Green Tubes manufactured in the [PRC] and Finished in Countries Other than the United States and the PRC at 31, AD CD 48 (May 31, 2013) ("Preliminary Scope Ruling"); Final Scope Ruling on Green Tubes Manufactured in the People's Republic of China and Finished in Countries Other than the United States and the People's Republic of China at 24, Feb. 7, 2014, ECF 31-1 ("Final Scope Ruling"); <u>see also</u> <u>Certain [OCTG] From the People's Republic of China</u>, 75 Fed. Reg. 28,551 (Dep't Commerce May 21, 2010) (amended final determination of sales at less than fair market

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

value and antidumping order) ("ADD Order"); Certain [OCTG] From the People's Republic of China, 75 Fed. Reg. 3,203 (Dep't Commerce Jan. 20, 2010) (amended final affirmative countervailing duty determination and countervailing duty order) ("CVD Order") (collectively "Orders"). For the reasons that follow, Commerce's determination is remanded for reconsideration or further explanation consistent with this opinion.

## BACKGROUND

The court assumes familiarity with the facts of this case as set out in the previous opinions and now recounts the facts relevant to the issue currently before the court. See Bell Supply I, 39 CIT __, 83 F. Supp. 3d 1311; Bell Supply Co., LLC v. United States, 40 CIT __, 179 F. Supp. 3d 1082 (2016) ("Bell Supply II"); Bell Supply Co., LLC v. United States, 40 CIT __, 190 F. Supp. 3d 1244 (2016) ("Bell Supply III"); Bell Supply Co., LLC v. United States, 888 F.3d 1222 (2018) ("Bell Supply IV"). On January 20, 2010 and May 21, 2010, respectively, Commerce published the countervailing and antidumping duty orders on OCTG from the PRC. See CVD Order, 75 Fed. Reg. 3,203; ADD Order, 75 Fed. Reg. 28,551. The Orders define the subject merchandise as:

> certain [OCTG], which are hollow steel products of circular cross-section, including oil well casing and tubing, of iron (other than cast iron) or steel (both carbon and alloy), whether seamless or welded, regardless of end finish (e.g., whether or not plain end, threaded, or threaded and coupled) whether or not conforming to American Petroleum Institute ("API") or non-API specifications, whether finished (including limited service OCTG products) or unfinished (including green tubes and limited service OCTG products), whether or not thread protectors are attached. The scope of the order also covers OCTG coupling stock. Excluded from the scope of the order are: casing or tubing containing 10.5 percent or more by weight of chromium; drill pipe; unattached couplings; and unattached thread protectors.

CVD Order, 75 Fed. Reg. at 3,203–04; ADD Order, 75 Fed. Reg. at 28,553.

Following a determination by U.S. Customs and Border Protection ("CBP"), see

Petition for Scope Inquiry at Ex. 1, 39, AD PD 1, bar code 3065185-01 (Mar. 26, 2012),[2]

that OCTG made from unfinished OCTG from the PRC—but finished in third countries—

had a country of origin other than the PRC, several domestic steel companies sought

clarification from Commerce regarding the scope of the Orders.[3]   On June 20, 2012,

pursuant to a request from several domestic companies, United States Steel Corporation,

TMK IPSCO, Wheatland Tube Company, Boomerang Tube LLC, and V&M Star L.P,

Commerce initiated a scope inquiry regarding Plaintiff's merchandise.  See Initiation of

Scope Inquiry, AD PD 25, bar code 3082712-01/CVD PD 25, 3082735-01 (June 20,

2012); see also 19 C.F.R. § 351.225(e) (2012).  Specifically, these domestic companies

sought clarification on whether the Orders covered OCTG finished in third countries but

made from unfinished OCTG (including green tubes) produced in the PRC.[4]   The

domestic companies argued that CBP's ruling conflicted with the mandate of the Orders

---

[2] On May 14, 2014, Defendant filed on the docket the indices to the public and confidential administrative records of this review.  See Administrative Record for Department of Commerce, May 14, 2014, ECF No. 31–3–6.  All further references to documents from the administrative record are identified by the numbers assigned by Commerce in these indices.  References to the administrative record for the antidumping investigation will contain "AD," and references to the administrative record for the countervailing duties investigation will contain "CVD."

[3] See Petition for Scope Inquiry, at Ex. 1, 39, ADD, PD 1, bar code 3065185-01 (Mar. 26, 2012) (CBP Ruling N118180 Re: The country of origin of steel tubing processed in Korea or Japan from green tubes originating in India, China, or Russia (Sept. 3, 2010)). Petitioners requested a country of origin determination ruling from CBP on steel threaded and coupled OCTG casing and tubing that is imported from Korea or Japan, where the original material was green tube or unfinished seamless steel pipe made in India, China or Russia.  CBP held that the product was substantially transformed and therefore had a country of origin of Korea or Japan.  CBP noted that although threading and coupling alone would not constitute substantial transformation, heat treating would because the heat treating imparts critical high yield strength required by American Petroleum Institute ("API") specifications for oil well tubing.

[4] Green tube is a type of unfinished OCTG, and references to unfinished OCTG will therefore include green tubes.  Final Results of Redetermination Pursuant to Remand at 1, Nov. 9, 2015, ECF No. 88-1.

on OCTG from the PRC, and that the Orders should cover the OCTG.  Id.  On February 7, 2014, Commerce issued a final scope ruling determining that unfinished green tubes manufactured in China and processed into finished OCTG in third countries are subject to the Orders because the merchandise is not substantially transformed during the finishing process.  See Final Scope Ruling at 2.

Plaintiff, Bell Supply Company, LLC ("Bell Supply") is a U.S. importer of OCTG sourced from Chinese green tubes later heat-treated and finished in Indonesia.  Plaintiff challenged Commerce's Final Scope Ruling in this court, arguing, inter alia, that Commerce's determination unlawfully expanded the scope of the Orders and relied on a substantial transformation analysis unsupported by substantial evidence and otherwise not in accordance with law.  Compl. ¶¶ 21, 25, Apr. 4, 2014, ECF No. 8; see Bell Supply I, 39 CIT at __, 83 F. Supp. 3d at 1313–14.

This court held that Commerce erred by applying the substantial transformation test, and that Commerce failed to follow the interpretive framework established in its regulations and thus unlawfully expanded the scope of the Orders to include Plaintiff's merchandise.  See Bell Supply I, 39 CIT at __, 83 F. Supp. 3d at 1328–30.  This court remanded Commerce's scope determination with instructions to "identify actual language from the scope of the Orders that could be reasonably interpreted to include OCTG finished in third countries in order to find that the merchandise is covered by the scope of the Orders," as required by the regulatory scheme.  Id. at 1329.

On remand, Commerce again found that the Orders cover OCTG made from green tubes from the PRC, even where they are finished in a third country.[5]   Under protest, Commerce abandoned its substantial transformation analysis, instead invoking the plain language of the Orders.  See Final Results of Redetermination Pursuant to Remand, at 2, 15, 20, Nov. 9, 2015, ECF No. 88-1 ("First Remand Results").  This court determined that Commerce's First Remand Results did not comply with the court's remand order in Bell Supply I, and that the results were not supported by substantial evidence and not in accordance with law.  Bell Supply Co. II, 40 CIT at __, 179 F. Supp. 3d 1082, 1090 (2016).  Although Commerce identified language in the Orders that Commerce believed covered green tubes manufactured in China and finished in third countries, this court held that the language was insufficient to permit such a conclusion.  See Bell Supply II, 40 CIT at __, 179 F. Supp. 3d 1082, 1091, 1094–95.  The court remanded Commerce's First Remand Results for further consideration and instructed that Commerce must interpret the Orders pursuant to the regulatory framework enumerated by 19 C.F.R. § 351.225(k)(1) (2013) and 19 C.F.R. § 351.225(k)(2) (2013) or, alternatively, conduct a circumvention analysis pursuant to 19 U.S.C. § 1677j(b) and 19 C.F.R. § 351.225(h) (2013).  Id. at 1098–99, 1105.

In its Final Results of Second Redetermination Pursuant to Remand ("Second Remand Redetermination"), Commerce determined that (1) the language of the Orders

---

[5] Commerce conducted the first remand redetermination under protest, noting that it "respectfully disagree[d] with the CIT that the Department improperly conducted a 'substantial transformation' test in this proceeding."  Final Results of Redetermination Pursuant to Remand, at 14, Nov. 9, 2015, ECF No. 88-1.  By adopting a position "under protest," Commerce preserved its right to appeal; the Court of Appeals has held that Commerce preserves its right to appeal in instances where Commerce makes a determination under protest and the Court of International Trade sustains its decision after remand.  See Viraj Grp., Ltd. v. United States, 343 F.3d 1371, 1376 (Fed. Cir. 2003).

does not cover unfinished OCTG manufactured in the PRC and finished in third countries,

and (2) that imports of finished OCTG from Indonesia processed from unfinished green

tubes from China do not circumvent the Orders pursuant to 19 U.S.C. § 1677j(b).  See

Second Remand Redetermination, at 1, 5, 19–20, 33–35, Aug. 11, 2016, ECF No. 132-

1.  Per this court's instruction, Commerce utilized the 19 C.F.R. § 351.225(k)(1) and (2)

factors in its analysis regarding whether OCTG finished in third countries fall within the

orders.  See id. at 5, 14–19.  Commerce found that the (k)(1) and (k)(2) factors did not

support a finding that the OCTG finished in Indonesia were covered by the Orders.  Id. at

15–19.  With respect to its circumvention analysis under § 1677j, Commerce explained

that "the process of assembly or completion performed . . . in Indonesia is neither minor

nor insignificant."  Id. at 33.  Commerce, therefore, found that OCTG finished in Indonesia

and made from green tubes from the PRC are not covered by the Orders.

Defendant-Intervenors appealed Commerce's scope ruling, and this court upheld

the ruling.  See Bell Supply III, 40 CIT __, 190 F. Supp. 3d 1244, 1246 (2016) (reasoning

that Commerce, in its Second Remand Redetermination, complied with the court's order

in Bell Supply II and that Commerce's conclusions were supported by substantial

evidence).  Defendant-Intervenors appealed this court's decision to the Court of Appeals

for the Federal Circuit.  See Bell Supply IV, 888 F.3d 1222 (2018).  The Court of Appeals

vacated and remanded this court's decision in Bell Supply III, holding that Commerce may

use the substantial transformation analysis to determine country of origin prior to

conducting a circumvention inquiry.  Bell Supply IV, 888 F.3d at 1224–25, 1229. The

Court of Appeals clarified that the substantial transformation analysis, used to determine

where goods are from, precedes the circumvention inquiry, and that the circumvention

analysis enters the fray only when Commerce determines that goods are from a country not covered by the relevant AD or CVD orders. Id. at 1229. Thus, this court must now determine whether Commerce's application of the substantial transformation analysis is supported by substantial evidence. For the reasons that follow, the court remands Commerce's determination that OCTG made from green tubes from the PRC and finished in third countries were not substantially transformed.

## JURISDICTION AND STANDARD OF REVIEW

The court exercises jurisdiction over Plaintiff's claim under 19 U.S.C. § 1516a(a)(2)(B)(vi) and 28 U.S.C. § 1581(c) (2012), which grant the court authority to review actions contesting scope determinations that find certain merchandise to be within the class or kind of merchandise described in an antidumping or countervailing duty order. The court must "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

An antidumping or countervailing duty order must "include[ ] a description of the subject merchandise, in such detail as the administering authority deems necessary." 19 U.S.C. §§ 1671e(a)(2), 1673e(a)(2). This description creates the scope of the order. Issues arise regarding whether a particular product falls within the scope of an antidumping or countervailing duty, in part because federal regulations require Commerce to write the descriptions in "general terms." 19 C.F.R. § 351.225(a) (2012). The Court of Appeals held in Bell Supply IV that Commerce may use the substantial transformation analysis to determine country of origin for an imported article, see Bell Supply IV, 888

F.3d at 1229, noting that a "substantial transformation occurs where, 'as a result of

manufacturing or processing steps ... [,] the [product] loses its identity and is transformed

into a new product having a new name, character and use." Bell Supply IV, 888 F.3d at

1228–29 (quoting Bestfoods v. United States, 165 F.3d 1371, 1373 (Fed. Cir. 1999)).[6]

---

[6] Although the Court of Appeals quotes Bestfoods to invoke the name, character or use test, Bestfoods involved a North American Free Trade Agreement country of origin determination applying statutory tariff-shift rules as opposed to Gibson-Thomsen's "name, character and use" test, which evolved in Customs law. The Gibson-Thomsen name, character and use test provides that a product undergoes substantial transformation if, as a result of manufacturing or processing steps, the imported product loses its identity and is transformed into a new product having "a new name, character and use." See United States v. Gibson-Thomsen Co., 27 CCPA 267, C.A.D. 98 (1940); see also Bestfoods, 165 F.3d at 1372-73.

The courts and Customs have employed a variety of factors to assess whether a product has acquired a new name, character or use depending upon the product at issue. For example, Customs cases have enquired as to whether an article will become an "integral part" of another product, such that it acquires a new name, character and use. See, e.g., Diamond Match Co. v. United States, 45 Cust. Ct. 198, C.D. 2223 (1960) (ice cream sticks imported in bundles became an integral part of the ice cream-on-a-stick, taking on a new name, character, and use.); Grafton Spools, Ltd. v. United States, 45 Cust. Ct. 16, C.D. 2190 (1960) (empty spools for ribbons for business machines became an integral part of the machine and had a new name, character, and use). Compare Uniroyal, Inc. v. United States, 3 CIT 220, 226, 542 F.Supp. 1026, 1031 (1982), aff'd, 702 F.2d 1022 (Fed. Cir.1983) (finding that uppers were already the essence of a finished shoe). Other Customs cases have focused more particularly on the change in the use of the product as a result of processing. See, e.g., Ferrostaal Metals Corp. v. United States, 11 CIT 470, 477, 664 F.Supp. 535, 541 (1987) (finding the process of continuous hot-dip galvanizing of Japanese full hard cold-rolled sheet changed the uses and character of the sheet by changing the chemical composition and providing corrosion resistance). Compare Superior Wire v. United States, 11 CIT 608, 616, 669 F.Supp. 472, 479 (1987) (finding no substantial transformation because of, inter alia, the lack of different uses after processing). More specifically, the court has also enquired as to whether products, as a result of processing, change from producers' goods to consumers' goods. See, e.g., Midwood Indus., Inc. v. United States, 64 Cust. Ct. 499, 508, C.D. 4026, 313 F. Supp. 951, 957 (Cust. Ct. 1970) (finding imported forgings were producers' goods which after processing became consumers' goods, specifically fittings and flanges, having a different name, character and use). See also Boltex Mfg. Co., L.P. v. U.S., 24 CIT 972, 140 F. Supp. 2d 1339 (2000) (chronicling various approaches to the substantial transformation inquiry within Customs law).

For green tube or unfinished seamless steel pipe, Customs, in the ruling that prompted the petitioners to seek a scope ruling from Commerce, focuses on the fact that "heat treating imparts the critical high yield strength required by A.P.I. specifications for oil well tubing." Petition for Scope Inquiry at Ex. 1, 39, AD PD 1, bar code 3065185-01 (Mar. 26, 2012) (CBP Ruling N118180 Re: The country of origin of steel tubing processed in Korea or Japan from green tubes originating in India, China, or Russia (Sept. 3, 2010)).

(footnote continued)

To determine if substantial transformation has occurred, Commerce considers five factors: (1) the class or kind of merchandise; (2) the nature and sophistication of processing in the country of exportation; (3) the product properties, essential component of the merchandise, and intended end-use; (4) the cost of production/value added; and (5) the level of investment. See Preliminary Scope Ruling at 14–29; Final Scope Ruling at 16–23. Products that undergo a substantial transformation in a foreign country may be considered to be from that country, effectively removing them from the ambit of AD or CVD orders applying to the original country.

In both its Preliminary and Final Scope Rulings, Commerce determined that the processing of seamless unfinished OCTG from the PRC into finished OCTG in Indonesia does not constitute substantial transformation. Preliminary Scope Ruling at 31; Final Scope Ruling at 24. In reaching its conclusion, Commerce appears to rely upon its findings with respect to all five factors of its test comprising its totality of the circumstances analysis. See, e.g., Preliminary Scope Ruling at 31 (relying on each factor "to the extent practicable" and "the totality of the circumstances" to reach its conclusion that the downstream processing of seamless unfinished OCTG from the PRC into finished OCTG does not constitute substantial transformation). Commerce fails to explain how three of the factors upon which it relies support its determination. Therefore, the court remands the matter for further explanation or reconsideration consistent with this opinion.

---

In Bell Supply IV, although the Court of Appeals speaks of the name, character or use test, it does not invoke any of the factors used in Customs cases and specifically states the factors Commerce considers to determine whether there has been a substantial transformation. See Bell Supply IV, 888 F.3d at 1228–29. Specifically, these factors are "(1) the class or kind of merchandise; (2) the nature and sophistication of processing in the country of exportation; (3) the product properties, essential component of the merchandise, and intended end-use; (4) the cost of production/value added; and (5) level of investment." Id.

Commerce first considered whether the product falls within the same class or kind of merchandise before and after processing.  Preliminary Scope Ruling at 16.  Commerce found that green tube and finished OCTG fell within the same class or kind of merchandise, noting that "the clear language of the scope indicates finished and unfinished OCTG are of the same class or kind."  Preliminary Scope Ruling at 16.

Commerce does not explain how its finding that the two products are of the same class or kind of merchandise supports its ultimate conclusion that there has not been a substantial transformation.  Commerce states that it has "continued to accord the class or kind of merchandise criterion with the consideration required under the Department's standard analysis."  Final Scope Ruling at 16.  Commerce incorporates this factor into its analysis and appears to rely on it as part of its totality of the circumstances analysis, yet nowhere does it explain how this factor supports its determination, and its rationale is not reasonably discernable.  Finished and unfinished OCTG are part of the same class only because the petitioners requested that Commerce investigate the two together.  See Petition for Scope Inquiry 2, AD PD 1, bar code 3065185-01 (Mar. 26, 2012); Certain [OCTG] from the People's Republic of China, 74 Fed. Reg. 20,671 (Dep't Commerce May 5, 2009) (notice of init.).  Without further explanation, it is not clear how this factor does any work in this case.  Commerce does not explain, and it is not reasonably discernible, how this factor bears any relationship to whether the downstream processing was sufficient to cause a substantial transformation.  Although Commerce seems to minimize the importance of this factor, stating that no one factor is dispositive,[7] Final Scope Ruling

---

[7] Commerce explains that although a finding that products belong to the same class or kind is "an

(footnote continued)

at 16, the weight to be accorded to this factor does not substitute for explaining its

usefulness.[8]  Commerce must provide a reasonable explanation regarding how this factor

contributes to its conclusion.

Commerce next considered the nature/sophistication of processing in the country

of exportation, determining that the finishing process performed in Indonesia did not

warrant a finding of substantial transformation.  Preliminary Scope Ruling at 19; Final

Scope Ruling at 17.  In its Preliminary Scope Ruling, Commerce explained that it does

not base its analysis on whether the upstream production is more or less sophisticated

than the downstream processing, but that it does not exclude the upstream production

from its analysis.  Preliminary Scope Ruling at 19.  The analysis instead focuses on the

extent and complexity of the downstream processing, and the changes to the product

imparted by the processing.  Id.  Commerce described the processing conducted in

Indonesia, noting that it entails "quenching and tempering, upsetting on certain

merchandise, threading (for external or integral joint), and coupling (for some

merchandise)."  Preliminary Scope Ruling at 19. Commerce noted that, although the

processing is "not insignificant," id., the heat treatment process is completed with relative

ease and with the help of standardized equipment.  Id. at 19–20.  Moreover, Commerce

---

important factor" in the substantial transformation analysis, it is not dispositive.  Preliminary Scope Ruling at 16.  In its Final Scope Ruling, Commerce noted that although the issue of class or kind "may have lesser importance" in some situations than others (seeming to imply this was one such case), it is still a factor that Commerce considers as part of the substantial transformation analysis. Final Scope Ruling at 16.

[8] Although Commerce attempts to minimize the impact of the class or kind of merchandise factor by stating that no one factor is dispositive, Final Scope Ruling at 16, Commerce invokes the same factor in its discussion of the cost of production/value added in its Preliminary Scope Ruling, suggesting that the product's class or kind of merchandise served as one of the more important factors in its analysis.  See Preliminary Scope Ruling at 25.

noted that the threading process is standardized, and is commonly utilized by companies on tubing prior to its sale.  Accordingly, Commerce concluded that this process was not more sophisticated than techniques commonly used in the steel industry, and thus did not warrant a finding of substantial transformation.  Id. at 20.

In its Final Scope Ruling, Commerce departed from the analytical approach described above.  Commerce emphasized the importance of the unfinished OCTG product relative to the contribution of the finishing process, and explained that it would not be possible to produce a finished, heat-treated OCTG product without first creating the upstream, unfinished OCTG product.  Final Scope Ruling at 17.  Commerce thus concluded that, compared to the complex production process used to create unfinished OCTG in the PRC, the heat treatment process conducted in Indonesia was not more sophisticated.  Id.  Consideration of the nature of the production process did not, according to Commerce, warrant a finding of substantial transformation.

This approach is not reasonable.  Commerce abandoned its previous analytical approach—an examination of the extent and complexity of the downstream processing and any changes imparted to the product by that processing—in favor of a strict comparative methodology.  Yet, as Commerce correctly noted in its Preliminary Scope Ruling, "if every downstream steel production process were compared to the making of hot-rolled steel, the Department might potentially find it difficult to separate classes or kinds of steel products beyond the hot-rolled steel stage."  Preliminary Scope Ruling at 19.  Indeed, this type of strict comparative analysis could preclude a finding of substantial transformation for any downstream processing.  Such an approach strays from the focus of the inquiry, i.e., whether substantial transformation occurs as a result of the

downstream processing.  Plaintiff correctly notes that Commerce's comparative approach

necessarily implies that the only situation where third-country processing could result in

substantial transformation is when the processing is more sophisticated than any other

step in producing the entire product.  Reply Br. Pl. [Bell Supply] Supp. Mot. J. Agency R.

at 19, Feb. 11, 2015, ECF 68 ("Pl. Reply Br."); <u>see also</u> Final Scope Ruling at 17

(determining that the "heat treatment conducted in Indonesia is not more sophisticated

than . . . producing the unfinished OCTG in the PRC.").  A scenario could conceivably

arise in which a downstream production process, though less sophisticated than the

upstream production process, is still sophisticated for purposes of the substantial

transformation test.  Without further explanation, Commerce's determination regarding

the nature/sophistication of the processing fails to support its conclusion that substantial

transformation did not occur.[9]

Commerce next considered the product properties, the essential component of the

merchandise, and the intended end-use, concluding that this factor did not support a

finding of substantial transformation.  Commerce stated in its Preliminary Scope Ruling

that although the finishing process in Indonesia conferred different mechanical properties

---

[9] It is not unreasonable for Commerce to consider the production process required to produce unfinished OCTG in its evaluation of the sophistication of the downstream processing.  Doing so enables Commerce to contextualize the analysis in the relevant industry.  Moreover, bearing in mind the salient question of whether the product has been substantially transformed, permitting Commerce to examine the heat treating process against the backdrop of the upstream production process seems logical.  Requiring Commerce to examine the downstream processing in a vacuum, without any reference to the production required to create the input for the third-country processing, would deprive Commerce of important data that goes to the heart of the country of origin inquiry.  Nonetheless, reducing the analysis to a mere comparison between the downstream and upstream processing does not aid in the substantial transformation inquiry in this case.  Commerce must determine whether the downstream processing is so significant "as to require that the resulting merchandise be considered the product of the country in which the transformation occurred."  <u>Bell Supply IV</u>, 888. F.3d at 1229 (quoting <u>E.I. Du Pont</u>, 8 F. Supp. 2d at 858).

on the finished OCTC compared to the green tubes, the major physical and chemical properties of both finished and unfinished OCTG are imparted during the steel forming process.   Preliminary Scope Ruling at 22.   Additionally, despite the fact that the downstream processing conducted in Indonesia altered the OCTG's mechanical properties, Commerce concluded that the essential component of the merchandise—both finished and unfinished OCTG—is the green tube produced in the PRC.   Id. at 22. Commerce explained this determination by noting that although heat-treated (and threaded and coupled) OCTG is not necessarily interchangeable with the unfinished OCTG in question, unfinished OCTG may still be used as a vehicle for oil and gas extraction.   Id. at 22–23.   Commerce cited several examples of pipe grades under the American Petroleum Institute ("API")-5CT specification that do not require heat treatment to qualify for such specifications.   Id. at 23.   Commerce emphasized that although heat treatment conferred new mechanical properties, these mechanical alterations did not change the essential component of the merchandise, since the record indicates that unfinished OCTG can be used for oil and gas extraction.   Id. at 22–23.   Because the physical and chemical properties of the OCTG did not change significantly as a result of the third-country processing, and because the heat treatment was not required in order for the product to be used for oil and gas extraction, Commerce concluded that the physical and chemical characteristics of green tube, rather than the subsequent heat treating in Indonesia, determined the green tube's ultimate use as OCTG.   Id. at 23.

In its Final Scope Ruling, Commerce affirmed its preliminary determination, noting that all of a product's characteristics—physical, chemical, and mechanical—are equally important and are evaluated on a case-by-case basis. Final Scope Ruling at 19.

Commerce explained that while the finishing process in Indonesia altered the mechanical and microstructure of the green tubes, the physical and chemical properties of the heat-treated OCTG product are equally important with regard to the product's structure, its size, and its end-use, and these properties are established during the production of the unfinished OCTG in the PRC.  Id.  Commerce therefore declined to use the mechanical properties of OCTG as the "dividing line," as doing so would diminish the importance of the production process necessary to create the unfinished OCTG in the PRC.[10]  Id.

Commerce's analysis regarding this factor is reasonable.  Plaintiff concedes that the chemical properties of finished OCTG are established by the chemistry of the green tube.  See Pl.'s Resp. to Scope Inquiry at 12, AD PD 33, bar code 3086198-01 (July 13, 2012).  Moreover, the record supports Commerce's determination that there are "few physical and chemical differences" between green tubes and heat-treated OCTG.[11]  Preliminary Scope Ruling at 23.  The fact that the third-country processing is not necessary for the product to be used for oil and gas extraction reasonably cuts in favor of a finding that the product's essential component is the green tubes from the PRC, and

---

[10] Commerce states that "the physical (dimensional) and chemical characteristics of that unfinished OCTG are what allow a company such as Citra Tubindo to conduct its further processing in the first place."  Final Scope Ruling at 19.  Plaintiff argues that Commerce's analysis is unreasonable because it reduces the analysis to a mere comparison between the importance of the upstream production and that of the downstream processing.  Mot. Pl. [Bell Supply] Supp. Mot. J. Agency R. 40–41, Sept. 19, 2014, ECF No. 36-1.  Such an analysis would be unreasonable, the argument goes, because it would preclude downstream processing from ever constituting substantial transformation, since without the upstream production, there would not be a product to undergo downstream processing.  Commerce's analysis is not as narrow as Plaintiff describes.  Commerce examined the physical, chemical, and mechanical properties of the finished OCTG, and determined that, based on the record, the physical and chemical properties were just as important in determining the product's essential component and end-use, and these properties are determined prior to the downstream processing.

[11] For example, the ITC found that green tubes and other unfinished OCTG are useable in the extraction of oil and gas without treatment and further finishing.  Final Scope Ruling at 18–19.

therefore the processing did not constitute substantial transformation.   See Preliminary

Scope Ruling at 22–23.

Plaintiff argues that it is the mechanical properties that enable the products to be

sold as P-110, T-95, and Q-125 OCTG, thus enabling the OCTG to be used for its

intended end-use.  Mot. Pl. [Bell Supply] Supp. Mot. J. Agency R. 39 n.11, Sept. 19, 2014,

ECF No. 36-1 ("Pl. Br.").   As previously described, however, this alteration does not

impact the physical and chemical properties of the product, all of which Commerce

properly considered.  Indeed, the record indicates that Bell Supply and Citra Tubindo, the

company responsible for processing in Indonesia, are responsible for selecting the

appropriate physical and chemical requirements of the green tubes, and the processing

does not change these properties.  Preliminary Scope Ruling at 23.  Also, the intended

end-use—oil and gas extraction—remains the same, even where the API certification

changes.  Preliminary Scope Ruling at 23 ("worth noting is that the application (*i.e.*, oil

and gas extraction) remains identical across all grades of OCTG").  Thus, although the

mechanical alterations may mean the products are more desirable for use in certain

environments, Commerce did not act unreasonably by concluding that the essential

component and intended end-use remain unchanged.

Plaintiff also argues that Commerce's conclusion regarding the properties,

essential component, and intended end-use factor conflicts with previous determinations.

Specifically, Plaintiff invokes two prior determinations for the proposition that Commerce

found the mechanical properties of steel to be a critical part of the finished merchandise

and that processing that imparts such properties constitutes substantial transformation.

Pl. Br. at 39 (citing Pl.'s Comments on Preliminary Scope Ruling at 30, AD CD 50 (June

24, 2013) ("Pure Magnesium from China"); Final Results of Redetermination Pursuant to

Court Remand in Peer Bearing Co.-Changshan v. United States, Court No. 10-00013,

Apr. 11, 2012, ECF 107-1 ("Peer Bearing")).  Commerce reasonably concluded that it was

not bound by these decisions.  In Pure Magnesium from China, the third-country

processing transformed the input product—pure magnesium—into an alloy of magnesium

in a new shape and with different chemical and mechanical properties.  Pl.'s Resp. to

Scope Inquiry at Ex. 2 and 3, AD PD 35 (Sept. 6, 2006).  This change in physical and

chemical properties is lacking here.  Moreover, Peer Bearing involved parts and

components that, prior to assembly, could not perform their respective functions as

tapered roller bearings parts because they had not been ground and polished into their

final dimensions, see Peer Bearing Co.-Changshan v. United States, 37 CIT __, 914 F.

Supp. 2d 1343, 1353 (2013), whereas here, the physical and chemical properties of the

OCTG remain largely unchanged, Final Scope Ruling at 19, and the OCTG is capable of

being used for oil and gas extraction before and after processing.  Preliminary Scope

Ruling at 23.  Examination of mechanical properties is just one part of the analysis, and

Commerce's analysis did not rest solely on the assertion that unfinished OCTG is the

product's essential element.  As described above, Commerce considered the importance

of the mechanical alterations imparted by the third-country processing, and ultimately

found that the physical and chemical properties of the finished OCTG were just as

important to the product's structure, size, and end-use, and that these properties were

established prior to the downstream processing.  Commerce correctly notes that it

evaluates the physical, chemical, and mechanical properties on a case-by-case basis,

and no individual category of characteristic is more determinative than another.  Final

**PUBLIC VERSION**

Scope Ruling at 19.    Accordingly, Commerce's determination that the product

characteristics, essential component, and intended end-use do not warrant a finding of

substantial transformation is supported by substantial evidence.

Commerce next considered the cost of production/value added, determining in its

Preliminary Scope Ruling that the value added by the third-country processing "ranged

from under [[      ]] percent for certain products to approximately [[      ]] percent for other

products."  Preliminary Scope Ruling at 25.  Additionally, Commerce determined that for

the heat treatment process, the value added is less than [[      ]] percent of the total value

of all OCTG products.  Id. at 25.  Commerce noted that no established threshold exists

for   determining   whether   a   certain   value-added   figure   constitutes   substantial

transformation, and the required amount can vary across industries.  Preliminary Scope

Ruling at 25.  Moreover, Commerce emphasized that the cost of production/value added

should be considered within the context of the broader case, and that the Department is

not   required   to   place   equal   weight   on   each   factor   when   making   a   substantial

transformation determination.  Id. at 25.

For its Final Scope Ruling, Commerce revised the value-added analysis for certain

products   based   on   supporting   calculations   provided   by   Plaintiff.     This   modification

enabled Commerce to convert Plaintiff's aggregated U.S. sales prices for certain sizes to

per-unit sales prices, as required by Commerce's value-added formula.  See Final Scope

Ruling at 20.  Commerce noted that, as a result of these changes, the value added for

certain products increased, id. at 20, but nevertheless concluded that, as a whole, the

value added by the third-country processing is not significant.  Id. at 22.  Commerce noted

that although the value added for one of the products in question increased to a point that

may, under certain circumstances, be considered significant, this particular product was not representative "on a quantitative basis" of the entire population of products in question. Id. at 22. Commerce based this determination on the low sales quantity of this product relative to that of all OCTG for which a U.S. sales price was provided, as well as to all OCTG covered by the scope ruling generally for which processing costs were reported. Id. at 21.

Commerce's handling of the cost of production/value added factor is not supported by substantial evidence. It is reasonably discernible that Commerce, in arriving at this conclusion, relied at least in part on the weighted-average of value added for all products, which was [[          ]] after processing. Final Scope Analysis Memo at 2, AD CR 54, bar code 3181447-01 (Feb. 7, 2014); Final Scope Ruling at 22 ("Based on the weighted-average value added percentage for all of the products covered by this scope ruling, we find that the value added . . . is not significant."). It is also reasonably discernible that Commerce, to some extent, considers the percentage of value added a proxy for the degree of transformation. Such an approach is reasonable; where a product's value sees a marked increase as a result of downstream processing, such processing could reasonably be perceived as probative of transformation. What is not reasonably discernible, however, is why Commerce found the percentage of value added in this case insignificant. Commerce provides little to no explanation on this point, and it is not clear at what percentage Commerce would consider value added significant under the circumstances. Also unclear is the extent to which the value-added factor was of greater or lesser importance in this case relative to other cases. Commerce reasonably notes that it does not have an established threshold for determining whether a certain value-

added figure constitutes substantial transformation on its own, and that the amount of value added required to substantially transform a product will vary significantly across industries.  <u>See</u> Preliminary Scope Ruling at 25.  Commerce is not obliged to establish a threshold, but without an established threshold or additional explanation relating to the facts of this case, Commerce's determination that the percentage of value added in this case is not significant lacks any rationale.  <u>See</u> Final Scope Ruling at 22.  For instance, Commerce would do well to explain why a level of [[          ]] overall value added is not significant within the context of the OCTG industry.[12]  Moreover, Commerce could explain the extent to which it relies less on this factor than on other factors for reasons specific to this case.  In its Preliminary Scope Ruling, Commerce states that the value-added factor is of less importance in this case than the physical, chemical, and mechanical characteristics of the OCTG, the product's intended end-use, and the class or kind of merchandise factor.  Preliminary Scope Ruling at 25.  However, Commerce does not reiterate this determination in its Final Scope Ruling, and given its seemingly diminished reliance on the class or kind of merchandise factor, the court cannot reasonably infer that Commerce carried this position over into its Final Scope Ruling.  Although a totality of the circumstances analysis eschews bright line rules for balancing, Commerce must explain how each factor weighs in the balance and why.  The failure to explain the reasonableness and weight of each factor results in an "I know it when I see it test," which

---

[12] It may be that a [[          ]] overall value added is insignificant under the circumstances, but Commerce must provide an explanation for such a determination that is supported by substantial evidence.  Stating that Commerce has no established threshold and that the amount of value added needed to substantially transform a product can vary across industries does not constitute a reasonable explanation.  <u>See</u> Preliminary Scope Ruling at 25.

is no test at all.  Commerce's determination that the level of value added by the third-country processing was not significant is therefore unreasonable.

With respect to the final factor—level of investment—Commerce found in its Preliminary Scope Ruling that the investment in the third-country processing was small in comparison to the investment required to build "a complete pipe mill."  Preliminary Scope Ruling at 27.  Commerce explained that previously adopted methods were inapplicable in this case because of the unique factual circumstances, paving the way for a "tailored" analysis based on the information in the record.  Id. at 23 and 29.  Accordingly, Commerce deemed the investment required for the processing performed in Indonesia "small in comparison" to that necessary for a complete pipe mill.  Id.  In its Final Scope Ruling, Commerce affirmed its position and explained that this analytical method is appropriate for a substantial transformation test, since the "primary purpose" of the test is to determine whether the third-country processing is significant relative to the production of finished or unfinished OCTG.  Final Scope Ruling at 23.

Commerce's determination on the level of investment factor is supported by substantial evidence.  Commerce's analysis determined that the investment required to conduct processing in Indonesia was insignificant in comparison to the investment required for a complete pipe mill.  Final Scope Analysis Memo at 2, CD 54, bar code 3181447-01 (Feb. 7, 2014).  Record evidence supports this conclusion.[13]

_____

[13] The record indicates that the investment made by Citra Tubindo in its processing facility in Indonesia constitutes approximately [[        ]] of the investment required by Tenaris S.A. in its complete seamless pipe mill.  See Final Analysis Memo, at Attachment 5, AD CR 54, bar code 3181447-01 (Feb. 7, 2014).

Plaintiff challenges Commerce's method of comparing the investment required for the finishing operations with that required to build a complete pipe mill.  See Pl.'s Br. at 42–43.  Here, as Commerce noted, the ideal analytical approach would be to compare the level of investment for the processing of OCTG in Indonesia to the investment required for the processing company to completely produce OCTG in Indonesia.  See Preliminary Scope Ruling at 28.  Because the processing company in this case does not engage in complete production of OCTG, the record does not allow such an analysis. Consequently, Commerce performed a tailored analysis based on information available on the record, comparing the investment in the processing in Indonesia with the investment made by Tenaris in its Bay City, Texas seamless pipe production facility.[14] Final Scope Ruling at 29.

It was reasonable for Commerce to compare the investment made in Indonesia to that required for complete pipe production.  It is reasonably discernable that Commerce examines the capital investment required for downstream processing as a proxy for the degree of transformation.  The greater the investment, the analysis goes, the greater the transformation of the product.  This approach is reasonable, so as not to evaluate the level of investment in a vacuum.  Different industries have different barriers to entry—a small capital investment in one industry might be significant in another.  Therefore, in order to contextualize the investment in further processing, it is reasonable to compare the level of investment required at different processing stages within the same industry.

---

[14] Although Commerce could have relied on investment data provided by suppliers from the PRC pursuant to the Department's investigation, Commerce reasonably declined to do so, noting that it would be inappropriate to rely on investment information from a company operating in a non-market economy.  Commerce also declined to use other examples provided by the petitioners. Preliminary Scope Ruling at 29.

A comparatively small investment in downstream processing indicates a lack of substantial transformation. Nowhere does Commerce state that in order to constitute a substantial transformation, the level of investment for the processing of unfinished OCTG must be equal to or greater than the cost of investing in a complete pipe mill. Commerce merely uses pipe mill investment as a comparative reference.[15]   The goal of the substantial transformation test is to determine whether the processing is "of such significance as to require" that the merchandise be deemed to be from that country. Bell Supply IV, 888. F.3d at 1229 (quoting E.I. Du Pont, 8 F. Supp. 2d at 858). In assessing significance, the investment required to produce the product is probative. Given the disparity between the investment in the processing in Indonesia and the investment required for complete pipe production and finishing operations, Commerce reasonably concluded that the level of investment was not significant for purposes of the substantial transformation test.

## CONCLUSION

For the reasons discussed above, Commerce's determination is not supported by substantial evidence. Therefore, in accordance with the foregoing, it is

---

[15] Although Plaintiff argues that the amount of investment and qualitative information pertaining to the investment should be the relevant inquiry for Commerce's analysis, it does not put forth record evidence to show why Commerce's choice to compare the processing investment to the investment required for a "greenfield pipe mill" is unreasonable. See Pl. Br. at 43. Plaintiff suggests an alternative methodology; it does not show Commerce's chosen methodology was unreasonable, and the court's task is to assess whether Commerce's methodological choice is reasonable and whether its conclusions are supported by substantial evidence. See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 48–49 (1983) ("[A]n agency must cogently explain why it has exercised its discretion in a given manner."); see Smith Corona Grp. v. United States, 713 F.2d 1568, 1571 (Fed. Cir. 1983), cert. denied, 465 U.S. 1022 (1984); Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1039 (granting Commerce significant deference in determinations "involv[ing] complex economic and accounting decisions of a technical nature"); Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 404–05, 636 F. Supp. 961, 966 (1986), aff'd, 810 F.2d 1137, 1139 (Fed. Cir. 1987).

**PUBLIC VERSION**

**ORDERED** that Commerce's determination is remanded for reconsideration or further explanation consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its remand redetermination with the court within 90 days of this date; and it is further

**ORDERED** that the parties shall have 30 days to file comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 30 days to file their replies to comments on the remand redetermination.


  /s/ Claire R. Kelly
Claire R. Kelly, Judge

Dated: October 18, 2018
       New York, New York