Slip Op. 19-89

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| BELL SUPPLY COMPANY, LLC, | |
|     **Plaintiff,** | |
| **v.** | |
| **UNITED STATES,** | Before: Claire R. Kelly, Judge |
|     **Defendant,** | Court No. 14-00066 |
| **and** | PUBLIC VERSION |
| **BOOMERANG TUBE LLC ET AL.,** | |
|     **Defendant-Intervenors.** | |

## <u>OPINION</u>

[Sustaining the U.S. Department of Commerce's Remand Determination.]

Dated: July 22, 2019

<u>Donald B. Cameron</u>, <u>Julie C. Mendoza</u>, <u>R. Will Planert</u>, <u>Brady W. Mills</u>, <u>Mary S. Hodgins</u>, <u>Eugene Degnan</u>, <u>Sabahat Chaudhary</u>, and <u>Ragan W. Updegraff</u>, Morris, Manning & Martin, LLP, of Washington, DC, for Plaintiff.

<u>Douglas G. Edelschick</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant. With him on the brief were <u>Joseph H. Hunt</u>, Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Claudia Burke</u>, Assistant Director. Of counsel on the brief was <u>Paul Keith</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Roger B. Schagrin</u> and <u>Christopher T. Cloutier</u>, Schagrin Associates, of Washington, DC, for defendant-intervenors Boomerang Tube LLC, TMK IPSCO Tubulars, V&M Star L.P., and Wheatland Tube Company.

<u>Gregory J. Spak</u>, <u>Frank J. Schweitzer</u>, <u>Kristina Zissis</u>, and <u>Allison Kepkay</u>, White & Case LLP, of Washington, DC, for defendant-intervenor Maverick Tube Corporation.

<u>Thomas M. Beline</u> and <u>Sarah E. Shulman</u>, Cassidy Levy Kent (USA) LLP, of Washington, DC, for defendant-intervenor United States Steel Corporation.

Kelly, Judge:     Before the court is the U.S. Department of Commerce's ("Commerce" or "the Department") remand redetermination pursuant to the court's decision in <u>Bell Supply Co., LLC v. United States</u>, 42 CIT __, Slip Op. 18-141 (Oct. 18, 2018) ("<u>Bell Supply V</u>").  <u>See</u> Final Results of Redetermination Pursuant to Remand, Mar. 29, 2019, ECF No. 216-1 ("<u>Third Remand Results</u>").[1]     In <u>Bell Supply V</u>, the court remanded Commerce's application of the substantial transformation test in the final determination of the scope ruling on certain oil country tubular goods ("OCTG") from the People's Republic of China ("PRC" or "China").  <u>Bell Supply V</u>, 42 CIT at __, Slip Op. 18-141 at 24–25.  In its scope ruling, Commerce applied a substantial transformation test and determined that seamless unfinished OCTG produced in China and finished in third countries had not undergone a substantial transformation and was thus within the scope of the antidumping duty ("ADD") and countervailing duty ("CVD") orders on OCTG from China.[2]  <u>See</u> Final Scope Ruling on Green Tubes Manufactured in the [PRC] and Finished in Countries Other than the United States and the [PRC] at 24, Feb. 7, 2014, ECF 31-1 ("Final Scope Ruling"); Preliminary Scope Ruling on Green Tubes manufactured in the

---

[1] Because Commerce's remand redetermination applied to both the antidumping duty ("ADD") and countervailing duty ("CVD") orders, Commerce filed two versions of its redetermination.  <u>See</u> Final Results of Redetermination Pursuant to Remand, Mar. 29, 2019, ECF No. 216-1; Final Results of Redetermination Pursuant to Remand, Mar. 29, 2019, ECF No. 216-2.  Both versions are identical other than the document number, and all further references are to the version cited above.

[2] Specifically, Commerce determined that the seamless unfinished OCTG is within the scope of the ADD and CVD orders where "1) the finishing consists of heat treatment by quenching and tempering, upsetting and threading (with integral joint), or threading and coupling; and 2) the products are made to the following specifications and grades: API specification 5CT, grades P-110, T-95 and Q-125."   Final Scope Ruling on Green Tubes Manufactured in the People's Republic of China and Finished in Countries Other than the United States and the People's Republic of China at 24, Feb. 7, 2014, ECF 31-1 ("Final Scope Ruling").

[PRC] and Finished in Countries Other than the United States and the PRC at 31, AD CD

48 (May 31, 2013) ("Preliminary Scope Ruling");[3] see also Certain [OCTG] From the

[PRC], 75 Fed. Reg. 28,551 (Dep't Commerce May 21, 2010) (amended final

determination of sales at less than fair value and [ADD] order) ("ADD Order"); Certain

[OCTG] From the [PRC], 75 Fed. Reg. 3,203 (Dep't Commerce Jan. 20, 2010) (amended

final affirmative [CVD] determination and [CVD] order) ("CVD Order") (collectively

"Orders").  The court remanded Commerce's application of the substantial transformation

test, holding that Commerce's findings with respect to three out of the five factors in its

totality-of-the-circumstances determination were unsupported by substantial evidence.

See Bell Supply V, 42 CIT at __, Slip. Op. 18-141 at 10.  Specifically, the court held that

Commerce failed to ground its conclusions in substantial evidence with respect to the

class or kind of merchandise, the nature/sophistication of processing in the country of

exportation, and the cost of production/value added.  Id., 42 CIT at __, Slip Op. 18-141 at

11–12, 13–14, 20–22.  On remand, Commerce reexamined these three factors pursuant

to its substantial transformation analysis and again concluded, based on the totality of the

circumstances, that the seamless unfinished OCTG in question falls within the scope of

the Orders.  Because Commerce's redetermination complies with the court's opinion in

---

[3] On May 14, 2014, Defendant filed on the docket the indices to the public and confidential administrative records of this review.  See Administrative Record for Department of Commerce, May 14, 2014, ECF No. 31-3–6.  On April 12, 2019, Defendant filed separate indices to the public and confidential administrative records for this remand redetermination.  See Administrative Record for Department of Commerce Remand, Apr. 12, 2019, ECF No. 218-1–4.  All references to documents from the initial administrative record are identified by the numbers assigned by Commerce in those indices and preceded by "PD" or "CD" to denote the public or confidential documents.  All references to the administrative record for this remand determination are identified by the numbers assigned in these indices and preceded by "RPD" or "RCD" to denote remand public and confidential documents.  Regardless of indices, all references to the administrative record for the antidumping investigation will contain "AD," and references to the administrative record for the countervailing duties investigation will contain "CVD."

Bell Supply V and is supported by substantial evidence, the court sustains the Third

Remand Results.

## BACKGROUND

The court assumes familiarity with the facts of this case as set out in the previous

opinions and now recounts the facts relevant to the court's review of Commerce's

redetermination.  See Bell Supply Co., LLC v. United States, 39 CIT __, 83 F. Supp. 3d

1311 (2015) ("Bell Supply I"); Bell Supply Co., LLC v. United States, 40 CIT __, 179 F.

Supp. 3d 1082 (2016) ("Bell Supply II"); Bell Supply Co., LLC v. United States, 40 CIT __,

190 F. Supp. 3d 1244 (2016) ("Bell Supply III"); Bell Supply Co., LLC v. United States,

888 F.3d 1222 (Fed. Cir. 2018) ("Bell Supply IV"); Bell Supply V, 42 CIT __, Slip. Op. 18-

141.  On January 20, 2010 and May 21, 2010, respectively, Commerce published the

CVD and ADD orders on OCTG from the PRC.  See CVD Order, 75 Fed. Reg. 3,203;

ADD Order, 75 Fed. Reg. 28,551.  The Orders define the subject merchandise as:

> certain [OCTG], which are hollow steel products of circular cross-section,
> including oil well casing and tubing, of iron (other than cast iron) or steel
> (both carbon and alloy), whether seamless or welded, regardless of end
> finish (*e.g.*, whether or not plain end, threaded, or threaded and coupled)
> whether or not conforming to American Petroleum Institute ("API") or non-
> API specifications, whether finished (including limited service OCTG
> products) or unfinished (including green tubes and limited service OCTG
> products), whether or not thread protectors are attached. The scope of the
> order also covers OCTG coupling stock. Excluded from the scope of the
> order are: casing or tubing containing 10.5 percent or more by weight of
> chromium; drill pipe; unattached couplings; and unattached thread
> protectors.

CVD Order, 75 Fed. Reg. at 3,203–04; ADD Order, 75 Fed. Reg. at 28,553.  On June 20,

2012, pursuant to a request from domestic steel companies United States Steel

Corporation, TMK IPSCO Wheatland Tube Company, Boomerang Tube LLC, and V&M

Star L.P, Commerce initiated a scope inquiry regarding Plaintiff's merchandise.  See

Initiation of Scope Inquiry, AD PD 25, bar code 3082712-01 (June 20, 2012); <u>see also</u> 19

C.F.R. § 351.225(e) (2013).[4]   Specifically, these domestic companies sought clarification

on whether the Orders covered OCTG finished in third countries but made from unfinished

OCTG (including green tubes) produced in the PRC.[5]   Initiation of Scope Inquiry at 1, AD

PD 25, bar code 3082712-01 (June 20, 2012).   On February 7, 2014, Commerce issued

a final scope ruling determining that unfinished OCTG manufactured in China and

processed into finished OCTG in third countries is subject to the Orders because the

merchandise is not substantially transformed during the finishing process.   <u>See</u> Final

Scope Ruling at 2, 16–23.

Plaintiff, Bell Supply Company, LLC ("Bell Supply"), challenged Commerce's Final

Scope Ruling in this court, arguing, <u>inter alia</u>, that Commerce's determination unlawfully

expanded the scope of the Orders and relied on a substantial transformation analysis

unsupported by substantial evidence and otherwise not in accordance with law.   Compl.

¶¶ 21, 25, Apr. 4, 2014, ECF No. 8; <u>see</u> <u>Bell Supply I</u>, 39 CIT at __, 83 F. Supp. 3d at

1313–14.   This court held that Commerce erred by applying the substantial transformation

test, and that Commerce failed to follow the interpretive framework established in its

regulations and, in doing so, unlawfully expanded the scope of the Orders to include

Plaintiff's merchandise.   <u>See</u> <u>Bell Supply I</u>, 39 CIT at __, 83 F. Supp. 3d at 1328–30.   This

court remanded Commerce's scope determination with instructions to "identify actual

language from the scope of the Orders that could be reasonably interpreted to include

---

[4] Further citations to Title 19 of the Code of Federal Regulations are to the 2013 edition.

[5] Green tube is a type of unfinished OCTG, and references to unfinished OCTG will therefore
include green tubes.   Final Results of Redetermination Pursuant to Remand at 1 n.2, Nov. 9,
2015, ECF No. 88-1 ("<u>First Remand Results</u>").

**PUBLIC VERSION**

OCTG finished in third countries in order to find that the merchandise is covered by the scope of the Orders." Id. at 1329.

On remand, Commerce found that the Orders cover unfinished OCTG produced in the PRC, even where the merchandise is finished in third countries. Final Results of Redetermination Pursuant to Remand at 2, Nov. 9, 2015, ECF No. 88-1 ("First Remand Results"). Under protest,[6] Commerce abandoned its substantial transformation analysis, instead invoking the plain language of the Orders. See First Remand Results at 2, 15, 20. This court determined that Commerce's First Remand Results did not comply with the court's remand order in Bell Supply I, and that the results were not supported by substantial evidence and not in accordance with law. Bell Supply II, 40 CIT at __, 179 F. Supp. 3d at 1090. Although Commerce identified language in the Orders that Commerce believed covered green tubes manufactured in China and finished in third countries, this court held that the language was insufficient to permit such a conclusion. See Bell Supply II, 40 CIT at __, 179 F. Supp. 3d at 1091, 1094–95. The court remanded Commerce's First Remand Results for further consideration and instructed that Commerce interpret the Orders pursuant to the regulatory framework enumerated by 19 C.F.R. § 351.225(k)(1) and 19 C.F.R. § 351.225(k)(2) or, alternatively, conduct a circumvention analysis pursuant to 19 U.S.C. § 1677j(b) and 19 C.F.R. § 351.225(h). Id. at 1098–99, 1105.

---

[6] Commerce conducted the first remand redetermination under protest, noting that it "respectfully disagree[d] with the CIT that the Department improperly conducted a 'substantial transformation' test in this proceeding." First Remand Results at 14. By adopting a position "under protest," Commerce preserved its right to appeal; the Court of Appeals has held that Commerce preserves its right to appeal in instances where Commerce makes a determination under protest and the Court of International Trade sustains its decision after remand. See Viraj Grp., Ltd. v. United States, 343 F.3d 1371, 1376 (Fed. Cir. 2003).

In its second remand redetermination, Commerce determined that (1) the language of the Orders does not cover unfinished OCTG manufactured in the PRC and finished in third countries, and (2) that imports of finished OCTG from Indonesia processed from unfinished green tubes from China do not circumvent the Orders pursuant to 19 U.S.C. § 1677j(b).  See Final Results of Second Redetermination Pursuant to Remand at 1, 5, 19–20, 33–35, Aug. 11, 2016, ECF No. 132-1 ("Second Remand Results").  Per this court's instruction, Commerce utilized the 19 C.F.R. § 351.225(k)(1) and (2) factors in its analysis regarding whether OCTG finished in third countries fall within the orders.  See id. at 14–19.  Commerce found that the (k)(1) and (k)(2) factors did not support a finding that the Orders covered OCTG finished in Indonesia. Id. at 15–19.  With respect to its circumvention analysis under section 1677j, Commerce explained that "the process of assembly or completion performed . . . in Indonesia is neither minor nor insignificant."  Id. at 33.  Commerce therefore found that unfinished OCTG produced in the PRC and finished in Indonesia fell outside the scope of the Orders.  Id. at 35.

Defendant-Intervenors appealed Commerce's scope ruling, and this court upheld the ruling.  See Bell Supply III, 40 CIT __, 190 F. Supp. 3d 1244, 1246 (2016) (holding that Commerce, in its Second Remand Results, complied with the court's order in Bell Supply II and that Commerce's conclusions were supported by substantial evidence). Defendant-Intervenors appealed this court's decision to the Court of Appeals for the Federal Circuit, and the Court of Appeals vacated and remanded this court's decision in Bell Supply III on the grounds that Commerce may use the substantial transformation analysis to determine country of origin prior to conducting a circumvention inquiry. Bell Supply IV, 888 F.3d at 1224–25, 1229.  The Court of Appeals clarified that the substantial

transformation analysis, used to determine country of origin, precedes the circumvention inquiry, and that the circumvention analysis enters the fray only when Commerce determines that goods are from a country not covered by the relevant ADD or CVD orders. Id. at 1229.

On remand, this court weighed whether Commerce's application of the substantial transformation analysis in the Final Scope Ruling was supported by substantial evidence. See Bell Supply V, 42 CIT at __, Slip Op. 18-141 at 8–24.  The court noted that in reaching its totality-of-the-circumstances conclusion that unfinished OCTG had not undergone a substantial transformation, Commerce appeared to rely on its findings with respect to each of the five factors of its substantial transformation test.  Id. at 10.  The court held that Commerce failed to reasonably explain how three of the factors upon which Commerce relied supported its determination that no substantial transformation occurred. Id.  Specifically, Commerce failed to provide adequate explanation with respect to the class or kind of merchandise factor, the nature/sophistication of processing factor, and the cost of production/value added factor.  Id. at 11–12, 13–14, 20–22.  On remand, Commerce reexamined the three factors described above to determine, based on the record, whether a substantial transformation occurred.  As described in greater detail below, Commerce concluded that seamless unfinished OCTG produced in China and finished in third countries falls within the scope of the Orders.  Third Remand Results at 1.

## JURISDICTION AND STANDARD OF REVIEW

The court exercises jurisdiction over Plaintiff's claim under 19 U.S.C. § 1516a(a)(2)(B)(vi) and 28 U.S.C. § 1581(c) (2012), which grant the court authority to review actions contesting determinations by Commerce regarding whether a particular type of merchandise falls within the class or kind of merchandise described in an ADD or CVD order.  The court must "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i).  "The results of a redetermination pursuant to court remand are also reviewed 'for compliance with the court's remand order.'"  Xinjiamei Furniture (Zhangzhou) Co. v. United States, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014) (quoting Nakornthai Strip Mill Public Co. v. United States, 32 CIT 1272, 1274, 587 F. Supp. 2d 1303, 1306 (2008)).

## DISCUSSION

On remand, Commerce again concluded that seamless unfinished OCTG produced in China but finished in third countries is within the scope of the Orders.  Third Remand Results at 1.  Commerce reexamined the factors in question, providing further analysis and determining based on the "totality of [its] findings" that the OCTG did not undergo a substantial transformation.  Id. at 21–22.  Plaintiff argues that Commerce's redetermination fails to address the court's concerns in Bell Supply V and that Commerce's explanation of these factors demonstrate that its substantial transformation determination is unsupported by substantial evidence.  Comments of Pl. Bell Supply Co., LLC on [Commerce's] Redetermination Pursuant to Ct. Remand at 2, Apr. 29, 2019, ECF No. 221 ("Pl.'s Comments").  For the reasons that follow, Commerce's totality-of-the-

circumstances determination that no substantial transformation occurred is supported by substantial evidence.

An ADD or CVD order must "include[ ] a description of the subject merchandise, in such detail as the administering authority deems necessary." 19 U.S.C. §§ 1671e(a)(2), 1673e(a)(2). This description creates the scope of the order. Issues arise regarding whether a product falls within the scope of an ADD or CVD order, in part because federal regulations require Commerce to write the descriptions in "general terms." 19 C.F.R. § 351.225(a). Country of origin is an essential element regarding whether a product falls within the scope of an ADD or CVD order. The Court of Appeals held in Bell Supply IV that Commerce may use the substantial transformation analysis to determine country of origin for an imported article, see Bell Supply IV, 888 F.3d at 1229, noting that a "substantial transformation occurs where, 'as a result of manufacturing or processing steps ... [,] the [product] loses its identity and is transformed into a new product having a new name, character and use." Bell Supply IV, 888 F.3d at 1228–29 (quoting Bestfoods v. United States, 165 F.3d 1371, 1373 (Fed. Cir. 1999)).

To determine if a substantial transformation has occurred, Commerce considers the totality of the circumstances, weighing five factors in particular: (1) the class or kind of merchandise; (2) the nature and sophistication of processing in the country of exportation; (3) the product properties, essential component of the merchandise, and intended end-use; (4) the cost of production/value added; and (5) the level of investment. See Preliminary Scope Ruling at 14–29; Final Scope Ruling at 16–23. Products that undergo a substantial transformation in a foreign country may be considered to originate

in that country, effectively removing them from the ambit of ADD or CVD orders applying

to merchandise from the original country.

In <u>Bell Supply V</u>, the court found Commerce's findings with respect to the third and

fifth factors reasonable in light of record evidence.  <u>See</u> <u>Bell Supply V</u>, 42 CIT at __, Slip

Op. 18-141 at 16–19, 22–24.   The court remanded Commerce's totality-of-the-

circumstances determination, holding that Commerce's findings with respect to the first,

second, and fourth factors were unreasonable.  <u>Id.</u> at 11–12, 13–14, 20–22.  Commerce

reexamined these factors on remand and provided further analysis regarding its overall,

totality-of-the-circumstances determination.

With respect to the class or kind of merchandise factor, Commerce found in its

preliminary determination that unfinished OCTG and finished OCTG fall within the same

class or kind of merchandise, noting that "the clear language of the scope indicates

finished and unfinished OCTG are of the same class or kind."  Preliminary Scope Ruling

at 16.  Commerce held its course regarding this factor in the final determination, noting

that it "continued to accord the class or kind of merchandise criterion with the

consideration required under the Department's standard analysis."  Final Scope Ruling at

16.  The court explained in <u>Bell Supply V</u> that Commerce failed to explain how its finding

that the two products are of the same class or kind of merchandise supports its conclusion

that a substantial transformation did not occur.  <u>Bell Supply V</u>, 42 CIT at __, Slip Op. 18-

141 at 11.  The court noted that unfinished and finished OCTG are part of the same class

only because the petitioners in the proceeding below requested that Commerce

investigate the two together, and thus it was unclear how this factor contributed to

Commerce's determination.   <u>Id.</u>  Missing from Commerce's determination, the court

explained, was any explanation regarding how the class or kind of merchandise factor "bears any relationship to whether the downstream processing was sufficient to cause a substantial transformation." Id.

On remand, Commerce maintained that the class or kind of merchandise factor contributes to its substantial transformation analysis because "it serves as an indicator of the degree of transformation." Third Remand Results at 12. Commerce explained that a change to a product's class or kind of merchandise as the result of downstream processing "is indicative of a more significant transformation than if the merchandise was of the same class or kind of merchandise both before and after processing." Id. Commerce disagreed with the court's concern that unfinished and finished OCTG are part of the same class or kind simply because the petitioners in the proceeding below requested that Commerce investigate the two together, arguing that it is ultimately Commerce's responsibility to determine the scope of the investigation. Id. at 9–11. Indeed, Commerce argued, although "the 'petition initially determines the scope of the investigation,'" it is Commerce that "'has the inherent power to establish the parameters of the investigation so that it would not be tied to an initial scope definition that . . . may not make sense in light of the information available to Commerce or subsequently obtained in the investigation.'" Id. at 10 (quoting Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1089 (Fed. Cir. 2002)). Moreover, Commerce noted that it may narrow or expand the class or kind of merchandise covered to address circumvention concerns, and the fact that Commerce kept the scope language unmodified in this case carries "significance beyond the fact that the petitioners proposed" the scope language. Id. at 11 (citing Torrington Co. v. United States, 14 CIT 507, 514, 745 F. Supp. 718, 723–24

(1990)).  That the OCTG belongs to the same class or kind before and after processing,

Commerce concluded, "indicates a lesser degree of transformation than if the

merchandise were not of the same class or kind before and after processing."  Id. at 12–

13.

Commerce fails to reasonably explain how its findings on this factor contribute to

its conclusion that no substantial transformation occurred.  Commerce's explanation that

it ultimately delineates the scope definition in the order does not address the fundamental

problem with this factor.[7]  The class or kind of merchandise is a determination made by

Commerce regarding what the final order should cover, and it is unclear on the facts of

this case how such a determination is relevant to Commerce's country of origin analysis.[8]

---

[7] Commerce's invocation of Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1096 (Fed. Cir. 2002) is unavailing.  There, the Court of Appeals for the Federal Circuit reversed the Court of International Trade's holding that the proper method by which Commerce must interpret the scope of an ADD or CVD order is to "first consider whether the underlying petitions cover the product." Id. at 1096 (quoting Duferco Steel, Inc. v. United States, 25 CIT 493, 500, 146 F. Supp. 2d 913, 921–22 (2001)).  The Court of Appeals held that the proper inquiry is whether the final scope order, defined by Commerce, includes the subject merchandise.  Id. at 1096.  The Court explained that

> [t]he critical question is not whether the petition covered the merchandise or whether it was at some point within the scope of the investigation.  The purpose of the petition is to propose an investigation.  A purpose of the investigation is to determine what merchandise should be included in the final order.  Commerce's final determination reflects the decision that has been made as to which merchandise is within the final scope of the investigation and is subject to the order.

Id.  The court's holding in the present action does not run afoul of Duferco Steel.  Here, the determination does not turn on what the petition covered versus what the final order covered.  As explained above, with respect to the class or kind of merchandise factor in Commerce's substantial transformation analysis, it is of no moment that Commerce is ultimately responsible for defining the scope of the Orders.  The factor does not appear to do any work with respect to informing Commerce's substantial transformation determination in this case.

[8] Commerce acknowledged that this court has questioned the relevance of the class or kind of merchandise factor with respect to Commerce's substantial transformation analysis.  Third Remand Results at 8–9 (citing Peer Bearing Company-Changshan v. United States, 36 CIT __,

(footnote continued)

**PUBLIC VERSION**

Indeed, as Commerce acknowledged, if it determined in the investigation that the merchandise was not of the same class or kind of merchandise, it would divide the class in accordance with the various classes or kinds of merchandise.  Third Remand Results at 10–11 (explaining that Commerce "may narrow [the class or kind of merchandise covered] if Commerce determines a proposed scope includes multiple classes or kinds of merchandise").  In that scenario, the need for a country of origin determination—and thus a substantial transformation analysis—would cease.  Conversely, where Commerce elects in the investigation to keep the class together, Commerce's subsequent consideration of this factor in its substantial transformation inquiry amounts to "we decided they were the same, therefore they are the same."[9]  Commerce's reasoning is circular.  This factor seems to do little work as a general matter,[10] and more importantly,

---

__, 884 F. Supp. 2d 1313, 1320 (2012)).  Commerce reasons that Peer Bearing did not preclude Commerce from weighing this factor, so long as it explains the relevance of the factor as it relates to the substantial transformation analysis.  Third Remand Results at 9.  As discussed above, however, Commerce fails to explain how on this record the class or kind of merchandise contributes to its conclusion that no substantial transformation occurred.

[9] Commerce reasons—and Defendant argues—that if Bell Supply believed Commerce erred by including both unfinished and finished OCTG within the same class or kind of merchandise, Bell Supply should have submitted comments challenging Commerce's scope definition in the investigation, and it failed to do so, thus further illustrating that the class or kind of merchandise bears on the similarity of the products.  Def.'s Resp. to Comments on Remand Redetermination at 11, May 31, 2019, ECF No. 224; see also Third Remand Results at 24 (noting that "Bell Supply could have argued that finished and unfinished OCTG are of different classes or kinds").  Commerce's argument misses the mark for the reasons described above.  That Bell Supply could have submitted comments regarding the scope definition does not explain how the class or kind of merchandise contributes to Commerce's substantial transformation analysis in this case.  Even if it would have been prudent of Bell Supply to submit comments disputing Commerce's scope definition, Bell Supply's purported misstep sheds no light on how the class or kind of merchandise factor reasonably affects Commerce's substantial transformation analysis.

[10] In the final determination, Commerce arguably acknowledged the problem with this factor, conceding that "[u]ltimately, while in some situations, the issue of class or kind may have a lesser importance than other situations."  Final Scope Ruling at 16.

Commerce has not demonstrated that it supports its determination on this record.  It neither detracts from nor supports Commerce's totality-of-the-circumstances analysis.

As for the nature/sophistication of processing in the country of exportation, the court held in Bell Supply V that Commerce's approach in the final determination was unreasonable, noting that Commerce changed its methodology from the Preliminary Scope Ruling to the Final Scope Ruling.  42 CIT at __, Slip Op. 18-141 at 13.  Specifically, in the Preliminary Scope Ruling, Commerce examined the extent and complexity of the downstream processing and any changes imparted to the product by that processing.  Id. The court noted that Commerce abandoned that approach in the Final Scope Ruling in favor of a strict comparative methodology, examining the importance of the unfinished OCTG product relative to the contribution of the finishing process and concluding that the heat treatment process conducted in Indonesia was not more sophisticated than the complex production process used to create unfinished OCTG in the PRC.  Id. at 13–14. The court held that Commerce's approach strayed from the primary inquiry of whether a substantial transformation occurred as a result of the downstream processing.  Id. 13–14.

On remand, Commerce reexamined the nature/sophistication of third-country processing and continued to find that this factor weighs against a finding of substantial transformation.  Third Remand Results at 13–17.  Commerce maintained "that an analysis of the upstream versus downstream processes is warranted," but considers this analysis "within the context of [its] overall analysis of the nature and sophistication of production factor," and asserted that it did not intend to abandon its analysis from the preliminary determination.  Id. at 13.  Commerce explained that many of the basic physical characteristics remain unchanged by the processing, and that the third country

processing is "common and uses standard equipment." Id. at 16.   Commerce thus

concluded that "the extent and complexity of the downstream processing, and any

changes imparted to the product by that processing, do not indicate that the product in

question is substantially transformed." Id.

Commerce's redetermination reasonably explains how the nature and

sophistication of the third-country processing inform its substantial transformation

determination.   Commerce supported its finding that the heat treatment process is

common and uses standard equipment by highlighting record evidence showing that a

number of OCTG producers provide heat treatment.[11]   See Third Remand Results at 15

(citing Tianjin Pipe (Group) Corporation Schematic [attached as Ex. 15 to Scope Ruling

Request], AD PD 1–3 (Mar. 26, 2012) (showing schematic of tubular product production

that includes quenching and tempering); MetalBulletin Article [attached as Ex. 17 to

---

[11] Plaintiff argues that Commerce's conclusion that the processing is standard is unsupported by record evidence because "Citra Tubindo employs either the proprietary NSCT premium thread connection or the CTK-6 integral joint premium thread connection on the OCTG sold in the United States," and such connections "meet more rigorous requirements than the standard API 5CT connections." Pl.'s Comments at 9.   Commerce explains, however, that the fact that "Citra Tubindo uses certain proprietary threading connections . . . does not contradict that threading is [a] common process with various standards for types of thread joints." Third Remand Results at 28.   Moreover, Commerce explains, "the record does not establish that the thread connections used by Citra Tubindo are part of a more involved production process or a more transformative process than the production of similar thread connections." Id. at 29–29.   To the contrary, Commerce points to record evidence describing Citra Tubindo's proprietary [[          ]] tubing as "an integral joint upset pipe conforming to the [[                              ]] grade requirements," and describing an integral connection as one "threaded directly onto the pipe body." Third Remand Results at 29 (citing Respondents' Feb. 1, 2013 Questionnaire Resp. at 4, 12 AD CD 12–17 (Feb. 1, 2013)).   Such descriptions are consistent, Commerce argues, with the ITC's description of the manufacturing of OCTG, which discusses both the upsetting process and the process of threading directly onto pipe, thus indicating that these processes are not unique to Citra Tubindo's processes. Id. (citing Certain [OCTG] from China, USITC Pub. 4124 (Jan. 2010) (final) [attached as Ex. 1 to Petitioner's Feb. 19, 2013 New Factual Information Submission] at I-20, AD PD 87–98 (Feb. 19, 2013)).   It is thus clear that Commerce weighed the evidence potentially detracting from its conclusion that the nature and sophistication of the processing did not indicate a substantial transformation and came to a reasonable conclusion.

**PUBLIC VERSION**

Scope Ruling Request], AD PD 1–3 (Mar. 26, 2012) (describing Laguna Tubular Products

Corp.'s opening of an OCTG production facility that will include heat-treated products);

ArcelorMittal Document [attached as Ex. 21 to Scope Ruling Request], AD PD 1–3 (Mar.

26, 2012) (detailing ArcelorMittal's production facilities that conduct heat treatment of

tubular products)).    Commerce explained that the heat treatment process heats

unfinished green tubes at a controlled temperature, prior to quenching and tempering,

upsetting (for certain merchandise), threading, and coupling (for some merchandise), and

that nothing distinguishes the equipment used for these steps from what is commonly

used throughout the industry, and no party points to record evidence detracting from this

assertion.[12] Id. at 14–15.  Indeed, Commerce highlighted record evidence indicating that

Citra Tubindo's facilities maintain [[                        ]] for heat treatment, and that the

primary variations in the finishing process are between the threaded and coupled NSCC

premium connections and the [[                    ]] connections, from which it is

---

[12] Plaintiff attempts to counter Commerce's determination by arguing that the production process is "significant" and "imparts critical properties to the pipe that are essential to its use as P-110, T-95, and Q-125 grade OCTG.  Pl.'s Comments at 8.  Plaintiff avers that only heat-treated OCTG may be used in the applications for which P-110, T-95, and Q-125 grade OCTG are employed "due to the much greater burst and collapse ratings required."  Id. at 8 (citing Bell Supply Comments on Preliminary Scope Ruling at 25–26, AD PD 151 (June 24, 2013)).  As the court explained in Bell Supply V, these properties, important as they may be, do not impact the physical or chemical properties of the product, all of which Commerce properly considered.  42 CIT __, Slip Op. 18-141 at 17.  Moreover, the intended end-use—oil and gas extraction— remains the same regardless of changes to the API certification.  Preliminary Scope Ruling at 23.  Finally, it is reasonably discernible that Commerce concluded that the final properties of the product, though not insignificant, do not bear on the nature or sophistication of the processing that achieved those properties.  Indeed, Commerce determined that the processing is "easily performed through the use of standardized equipment and techniques that are widely available to companies that make heat treated tubular products."  Third Remand Results at 14 (quoting Preliminary Scope Ruling at 19–20).   Therefore, although the downstream processing results in mechanical alterations, Commerce's conclusion that the processing does not change the essential component and intended end-use is reasonable.

reasonably discernible that Commerce did not find these variations to be significant or to constitute highly sophisticated processes. Id. at 27–28 (citing Respondents' Feb. 1, 2013 Questionnaire Resp. at 3–4, AD CD 12–17 (Feb. 1, 2013)).   Further supporting Commerce's assessment is that Citra Tubindo's description of its heat treatment equipment comports with ITC findings describing heat treatment as a typical function of U.S. pipe mills. Id. at 28 (citing Certain [OCTG] from China, USITC Pub. 4124 (Jan. 2010) (final) [attached as Ex. 1 to Petitioner's Feb. 19, 2013 New Factual Information Submission] at I-15, PD 87–98 (Feb. 19, 2013)).   And although the processing changes the mechanical structure of the steel, Commerce explained that no chemical changes take place. Id. at 16.   Further, Commerce supported its conclusion that the basic physical properties remain unchanged, pointing to record evidence indicating that the "essential physical characteristics of OCTG such as overall straightness, diameter, and wall thickness are imparted in the forming stage when the steel is shaped into a steel tube suitable for use in the extraction of oil and gas." Id. at 14 (citing Scope Ruling Request at 16, AD PD 1–3 (Mar. 26, 2012)).   For these reasons, Commerce's findings with respect to the nature and sophistication of the third-country processing reasonably support its conclusion that no substantial transformation occurred.[13]

---

[13] Commerce includes in its analysis a reference to the upstream production process, which consists of the production of steel and the shaping of the steel into tubular form, but does not rely entirely on a comparative approach. Third Remand Results at 14–15; see also Bell Supply V, 42 CIT at __, Slip Op. 18-141 at 13–14 (explaining that a strict comparative methodology was not reasonable on the facts of this case).

Plaintiff argues that Commerce failed to support its finding that Citra Tubindo's processing operation consists of a standardized process easily performed by others in the industry, Pl.'s Comments at 8–10, contending that Citra Tubindo employs proprietary thread connections for the OCTG sold in the United States. Id. at 9. Commerce considered this evidence, however, and reasonably explained that Citra Tubindo's use of proprietary threading connections does not detract from its conclusion that threading is a common process in the industry with various standards for different types of thread joints. Third Remand Results at 28. Indeed, Commerce explained that the record does not demonstrate that Citra Tubindo's thread connections require a more involved production process than that of similar thread connections. Id. at 28–29.[14] Commerce observed that Plaintiff described Citra Tubindo's proprietary [[          ]] tubing as "an integral joint upset pipe conforming to the [[                    ]] grade requirements and described an integral connection as one "threaded directly onto the pipe body." Id. at 29 (citing Resp'ts' Feb. 1, 2013 Questionnaire Resp. at 4, AD CD 12–17 (Feb. 1, 2013)). Commerce reasonably observed that such descriptions align with the ITC's description of both the upsetting process and the process of threading directly onto pipe, thus indicating that such processes are not unique to Citra Tubindo's production.[15] Commerce also noted that its review of the record did not demonstrate that Citra Tubindo's NSCC connections are more

---

[14] Commerce explains that its review of the record demonstrates "that the production of Citra Tubindo's proprietary thread connections [[
          ]]." Third Remand Results at 29.

[15] The ITC, in its description of the manufacturing process of OCTG, describes the upsetting process and the process of threading directly onto pipe. See Certain [OCTG] from China, USITC Pub. 4124 (Jan. 2010) (final) [attached as Ex. 1 to Petitioner's Feb. 19, 2013 New Factual Information Submission] at I-20, AD PD 87–98 (Feb. 19, 2013) ("In the upsetting process, the end of the pipe is heated to forging temperature, then inserted endwise into an upsetting machine. The machine pushes the hot metal back, creating a thicker wall at the end of the pipe.").

transformative than what is common.[16]  Id. at 29.  Commerce therefore considered the relevant record evidence and supported its determination with record evidence that the processing in question is standard and easily performed by others in the industry.

With respect to the cost of production/value added factor, the court found in Bell Supply V that although it is reasonably discernible that Commerce views the percentage of value added as a proxy for the degree of transformation, and that such an approach is reasonable, it was not reasonably discernible why Commerce found the percentage of value added in this case to be insignificant.  42 CIT at __, Slip Op. 18-141 at 20–22.  The court also noted that it was not clear the extent to which this factor was of greater or lesser importance here relative to other cases.  Id. at 20.  Although Commerce does not have an established threshold for determining the point at which a certain value-added figure constitutes a substantial transformation, the court reasoned, without establishing such a threshold or providing further explanation regarding the specific facts of the case, Commerce's determination that the percentage of value added here is insignificant lacked any rationale.  Id. at 21.  Accordingly, the court held that Commerce failed to reasonably explain how the cost of production/value added factor supported its substantial transformation determination.

On remand, Commerce reexamined the cost of production/value added in light of record evidence, concluding that although the cost of manufacturing determined here "may weigh toward a finding of substantial transformation," this figure "is not dispositive

---

[16] Commerce notes that the Manufacturing and Inspection Plans for the products using NSCC connections [[

          ]].  Third Remand Results at 29 (citing Respondents' Feb. 1, 2013 Questionnaire Resp. at Ex. 4, Attachments C–F, AD CD 12–17 (Feb. 1, 2013)).  Commerce reasonably inferred from these plans that the processing required for the NSCC connections is not significantly different from that performed by other OCTG producers.  Id. at 29.

in and of itself" and that an "analysis, of all the factors, taken together, does not indicate substantial transformation." Third Remand Results at 20.  In response to the court's concern that Commerce failed to indicate this factor's relative importance in the final determination, Commerce reiterated its "finding that the cost of production/value added factor is not as critical in this proceeding as the other factors examined." Id. at 18. Commerce again declined to define a threshold at which the value added/cost of manufacture would indicate a substantial transformation, instead opting to reexamine this factor in light of its prior determinations and concluding that although the processing costs could indicate a substantial transformation, the other factors outweigh this factor in this case. Id. at 18–20.

Commerce's approach regarding the cost of production/value added factor on remand is reasonable.  Commerce noted that in the preliminary determination, it calculated the cost of services provided by Citra Tubindo to be between [[          ]]% of the total cost of production of finished OCTG.[17]  Third Remand Results at 19. Moreover, Commerce explained that it previously determined in Resin Thermal Transfer Ribbon that third-country processing services accounting for 34% of the total cost did not indicate a substantial transformation, as this figure was outweighed by Commerce's findings on other factors.  Id. at 19 (citing Wax and Wax/Resin Thermal Transfer Ribbon from the Republic of Korea, 69 Fed. Reg. 17, 645, 17,646 (Dep't Commerce Apr. 5, 2004) (notice of final determination of sales at not less than fair value)).  On the other hand,

---

[17] Commerce described the cost of production by Citra Tubindo as between [[                    ]] on page 19 of its redetermination, but later stated the range as [[                ]] on page 20. Third Remand Results at 19, 20.  The court presumes the former range is the accurate statement, as it matches the figure stated in the Preliminary Scope Ruling. Preliminary Scope Ruling at 25.

Commerce explained, previously it held that third-country cost of production accounting

for 38% of total cost of manufacture supported a finding that a substantial transformation

had occurred.  Id. at 20 (citing Peer Bearing Company-Changshan v. United States, 39

CIT __, __, 128 F. Supp. 1286, 1296 (2015)).  Thus, despite Commerce acknowledging

that the calculated cost of production here "may weigh toward a finding of substantial

transformation," Commerce concluded that, on this record, this fact is outweighed by the

fact that the "essential component of both the unfinished OCTG and finished OCTG is

inherent in the green tube manufactured in the PRC," and that the physical and chemical

characteristics determine the product's use as OCTG.  Id. at 18 (quoting Preliminary

Scope Ruling at 25).  Commerce properly reexamined its findings in light of record

evidence and its prior determinations, and despite the cost of production falling at a point

that could potentially weigh in favor of substantial transformation, Commerce came to a

reasonable conclusion based on the evidence.  Accordingly, the court will not disturb

Commerce's findings on this factor.  See Consolo v. Federal Maritime Comm'n, 383 U.S.

607, 620 (1966) (explaining that "the possibility of drawing two inconsistent conclusions

from the evidence does not prevent an administrative agency's finding from being

supported by substantial evidence").

Indeed, when examined in light of Commerce's findings with respect to the other

factors, Commerce's totality-of-the-circumstances determination is supported by

substantial evidence.  Specifically, Commerce reasonably found that the physical and

chemical characteristics of the merchandise are unchanged by the downstream

processing.  Preliminary Scope Ruling at 22.  Notably, the "steel tubular form of the

unfinished OCTG remains a steel tubular form, of the same size and shape, after the

**PUBLIC VERSION**

completion of the downstream production process." <u>Third Remand Results</u> at 21.  These

findings dovetail with the nature and sophistication of the processing, as well as the

product properties, the essential component of the merchandise, and the intended end-

use.  <u>See</u> Preliminary Scope Ruling at 22–23; Final Scope Ruling at 19.  Commerce found

that the physical characteristics are unchanged by the processing, which it reasonably

characterized as an indication that the processing is not particularly extensive or

sophisticated.   <u>Third Remand Results</u> at 21.   Moreover, such findings align with

Commerce's determination that the major physical and chemical properties of both

finished and unfinished OCTG are imparted during the steel forming process, that the

essential component of the merchandise is the green tube produced in the PRC, and that

it is the physical and chemical characteristics of green tube that determine the product's

ultimate use as OCTG.  Preliminary Scope Ruling at 22–23; Final Scope Ruling at 19.

Commerce also considered the level of investment in the third-country processing,

concluding that the investment was small compared to that required to build a complete

pipe mill, and thus indicated that no substantial transformation occurred.  Preliminary

Scope Ruling at 27.[18]  And although the court fails to see how Commerce's findings

regarding the class or kind of merchandise contribute to its analysis, on balance

Commerce's   totality-of-the-circumstances   determination   that   no   substantial

transformation occurred, and thus the seamless unfinished OCTG falls within the scope

of the Orders, is supported by substantial evidence.

---

[18] The court affirmed Commerce's findings regarding the product properties, essential component, and intended end-use, as well as the level of investment, in <u>Bell Supply V</u>, 42 CIT at __, Slip Op. 18-141 at 14–24.

**CONCLUSION**

For the foregoing reasons, Commerce's redetermination complied with the court's

remand order in <u>Bell Supply V</u> and is supported by substantial evidence.  Therefore, the

court sustains the <u>Third Remand Results</u>.  Judgment will enter accordingly.


                                                    /s/ Claire R. Kelly
                                                   Claire R. Kelly, Judge

Dated: July 22, 2019
       New York, New York